| | | |
|---|---|---|
| CHRISTOPHER CHEATHAM, on behalf of himself and all others similarly situated, | ) ) ) | Case No. 1:24-cv-109 |
| | ) | CLASS AND COLLECTIVE ACTION COMPLAINT |
| Plaintiff, | ) ) | |
| | ) | **JURY TRIAL DEMANDED** |
| vs. | ) ) | |
| CRST INTERNATIONAL HOLDINGS, LLC; CRST EXPEDITED, INC, d/b/a CRST THE TRANSPORTATION SOLUTION, INC.; and CRST SPECIALIZED TRANSPORTATION, INC d/b/a CRST SPECIALIZED SOLUTIONS, INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff Christopher Cheatham, individually and on behalf of all other persons similarly situated, by his undersigned attorneys as and for the Class Action and Collective Action alleges as follows:

## INTRODUCTION

1.      This is a class and collective action Complaint for fraudulent misrepresentation, unjust enrichment, forced labor, unpaid wages, liquidated damages, statutory fines, attorneys' fees and costs, and interest under the Iowa Code Annotated ("I.C.A."), Iowa common law, the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.,* and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

2.      Plaintiff Christopher Cheatham ("Mr. Cheatham" or "Plaintiff") is one of many people ("Plaintiffs" or "Plaintiff Drivers") recruited under false pretenses to receive

"sponsored" training for a Commercial Driver's License ("CDL") and then forced by debt and threatened abuse of legal process to drive for CRST International Inc., and its related companies ("CRST") even though their compensation per hour was less than minimum wage.

3.      Specifically, Plaintiff Drivers allege that (a) CRST made fraudulent representations, using false and misleading phone calls and advertising to induce drivers to enter into CRST's Commercial Driver's License Training and Repayment Agreement or similar arrangement; (b) CRST was unjustly enriched by the repayment agreement it forced Plaintiff Drivers to sign; (c) CRST deducted amounts from Plaintiff Driver wages in violation of I.C.A. § 91A.5(1); I.C.A. § 91A.5(2)(g) and I.C.A. § 730.5(6)(b); (d) Plaintiff Drivers were forced by debt and threat of legal process to drive for CRST in violation of the TVPA and the Iowa Human Trafficking Law; (e) CRST did not pay Plaintiff Drivers minimum wage for the hours they were due compensation in violation of Iowa law; (e) CRST did not pay Plaintiff Drivers minimum wage in violation of the FLSA.

4.      All allegations in this Complaint are based on information and belief except for those allegations pertaining specifically to Plaintiff, which are based on his personal knowledge. Each allegation in this Complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## PARTIES

5.      At all relevant times, Plaintiff Christopher Cheatham ("Plaintiff" or "Mr. Cheatham") was and is a natural person residing in Las Vegas, Nevada.

6.      Mr. Cheatham was an employee of CRST along with his similarly-situated

co-workers subject to the class and collective action allegations of this Complaint, "Plaintiffs" or "Plaintiff Drivers."

7.    At all relevant times, Plaintiff Drivers were "employees" for purposes of Plaintiffs' claims under Iowa Law and the FLSA in that Defendants suffered or permitted them to work.  I.C.A. § 91A.2(3)(a); 29 U.S.C. § 203(e), (g).

8.    Defendant CRST International Holdings LLC is the owner of CRST Expedited, Inc., and CRST Specialized Transportation, Inc.

9.    Defendant CRST International Holdings LLC controlled the policies and procedures of its subsidiaries.

10.    Defendant CRST Expedited, Inc., does business as CRST The Transportation Solution, Inc.

11.    Defendant CRST Specialized Transportation Inc. does business as CRST Specialized Solutions.

12.    Collectively, all CRST entities herein, ("CRST" or "Defendants") are privately owned companies owned and operated by related individuals and entities for a common business purpose:  transportation of freight for CRST customers.

13.    Defendant CRST Expedited, Inc. entered into the CRST Commercial Driver's License Training and Repayment Agreement with Plaintiff..

14.    Defendant "CRST The Transportation Solution, Inc. or CRST Specialized Solutions, Inc" made Mr. Cheatham a contingent offer of employment and underpaid Mr. Cheatham and Plaintiff Drivers.

15.    Defendants with their sister and parent companies have thousands of employee drivers and ex-drivers who signed the CRST Commercial Driver's License

3

Training and Repayment Agreement or were subject to a substantially similar scheme.

16.     Defendants with their sister and subsidiary companies have annual revenue in excess of $1.7 billion.

## JURISDICTION and VENUE

17.     Plaintiff incorporates and realleges all paragraphs above.

18.     Because Plaintiff's FLSA claims arise under federal law, the Court has federal question jurisdiction pursuant to 28 U.S.C § 1331.

19.     In addition, the Court has supplemental jurisdiction over Plaintiff's Iowa state-law claims under 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative fact regarding Defendants' unlawful treatment of Plaintiff, and form part of the same case and controversy.

20.     Venue is proper in this Court because Defendants are headquartered and operate within this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. See 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

21.     CRST is in constant need of long-haul team drivers, an unpopular and grueling position.

22.     CRST fills this need with a plan to force labor set out herein.

23.     CRST induces vulnerable individuals--people who have never been truckers before and therefore do not know better--by means of high-pressure phone calls, print, radio, television and internet advertising to drive for them.

24.     CRST's two key points in recruiting individuals are that (1) they will start off at $0.36/mile and (2) CRST will "sponsor" their training.

25.     CRST knew or had reason to know that its marketing point that new drivers will be paid $0.36/mile was false.

26.     CRST knew or had reason to know that it would in fact overcharge drivers for their training.

*Mr. Cheatham's Experience*

27.     Mr. Cheatham was managing a men's clothing store in Las Vegas, Nevada at the beginning of 2022.

28.     In the evenings he began searching for more long-term career prospects online.

29.     Mr. Cheatham came across CRST with its offer for "sponsored training" and input his phone number.

30.     Someone saying they were with CRST began calling him repeatedly, trying to convince him to join CRST and take advantage of the training.

31.     The person told him that this was the career he needed–that he would immediately make money starting at $0.36 per mile driven and that this amount would go up every month.

32.     This person told him that CRST would pay for his training to get the license he needed.

33.     Mr. Cheatham did not have his CDL so he signed up for CRST "sponsored" training.

34.     Mr. Cheatham believed that "sponsored" meant that he would not be charged for the training.

35. In reliance on CRST's representations, Mr. Cheatham quit his retail job to pursue working for CRST.

36. CRST sent him to attend Careers Worldwide, 45 South Main Street, Keenesburg, Colorado, for training for his CDL.

37. Mr. Cheatham had no right to choose which driving school he would attend.

38. CRST flew Mr. Cheatham to Keenesburg, Colorado, and for the first time, on the first day of training, Mr. Cheatham was given some very new information.

*i.* *Wage Deduction Authorization*

39. Before Mr. Cheatham was given an offer of employment by CRST, before Mr. Cheatham had commenced training, away from home, Mr. Cheatham was told he must sign a series of documents in order to commence training. The first was "Wage Deduction Authorization"

40. Mr. Cheatham signed his Wage Deduction Authorization on March 28, 2022.

41. Mr. Cheatham, now jobless and in a strange city, reliant on CRST for food and shelter, had no choice but to sign the Wage Deduction Authorization and the other documents put before him that day.

42. Mr. Cheatham's fellow Plaintiff Drivers were similarly situated and without choice.

43. The Wage Deduction Authorization indicates:

I hereby authorize CRST Inc. d/b/a CRST The Transportation Solution, Inc ("CRST") to withhold from my weekly wages the total amount equaling $0.03 per Total Movement Mile which shall be withheld for the purpose of repaying my financial obligations under my CRST Commercial Driver's License Training and Repayment Agreement (the "Agreement"). … I

represent that this authorization is executed voluntarily and has not been made as a condition of my continued employment.

44. This was the first time Mr. Cheatham found out that when CRST said it would sponsor his CDL training, it did not mean that it would pay for it. "Sponsored" did not mean "free."

45. Mr. Cheathem did not understand what "Total Movement Mile" meant.

46. At the time Mr. Cheatham agreed to the Wage Deduction Authorization, he still believed that he would be making $0.36/mile and after the withholding he would still be paid $0.33/mile.

ii. *Drug Test*

47. On March 21, 2022, CRST International, Inc. ordered a standard criminal screening package on Mr. Cheatham.

48. On June 5, 2022, Mr. Cheatham submitted to drug testing at the behest of CRST. The name of the drug test was "Pre-Employment/Pre-Access Non-DOT Drug Test."

49. The third party administering the drug test was called TPA ComplyFirst and was and is based in New Jersey.

iii. *CRST Commercial Driver's License Training and Repayment Agreement*

50. CRST, through the training school, also forced Mr. Cheatham to sign CRST Commercial Driver's License Training and Repayment Agreement ("Agreement") in order to commence training.

51. The Agreement asserts that the cost of the training Program is five thousand, seven hundred fifty dollars ($5,750.00).

52. The amount that CRST actually paid Careers Worldwide (the driving school in Keenesburg, Colorado) for Mr. Cheatham's training is unknown.

53. Upon information and belief, the true cost of the "CDL training school tuition" is not $5,750 but rather around $2,000 to $2,500.

54. Further CRST illegally charged Plaintiff and Plaintiff Drivers via the Agreement. Included in the $5,750 that will be charged to drivers (at Para 2 of the Agreement) are:

> [t]ransportation to the training school; lodging during training, up to two meals/day during training, federally required DOT physical and DOT Drug test, hair drug test, CLP Assistance and other fees, costs and expenses incurred by CRST

55. I.C.A. § 730.5 provides that employers may not charge employees for drug tests.

56. I.C.A §91A.5(1) provides that employers may not withhold employee's wages unless there is a lawful purpose accruing to the benefit of the employee.

57. I.C.A §91A.5(2)(g) provides that it is unlawful for employers to charge employees for costs of more than twenty dollars for an employee's relocation to the place of employment.

58. Besides forcing Mr. Cheatham and the Plaintiff Drivers to pay costs unlawfully charged, the Agreement seals Mr. Cheatham's fate. It informs Mr. Cheatham without choice that:

> CRST will deduct from his paycheck $0.03 per Total Movement Mile for 100,000 Total Movement Miles, totaling $3,000 (three thousand U.S. Dollars). Upon completion of 100,000 Total Movement Miles, CRST will waive the remaining balance of the $2,750.

59.     Considering that CRST was willing to forgive $2,750 of the cost if Plaintiff and Plaintiff Drivers drove 100,000 miles with CRST, it is extremely unlikely that the program cost CRST more than $3,000.

60.     That makes $2,750, when it was charged by CRST, a usurious penalty charge and pure profit to CRST.

61.     The threat of the usurious penalty charge is an abuse of legal process.

62.     Paragraph 4 of the Agreement states that:

[i]n the event You do not accept or are not offered employment with CRST, the total Cost of the Program (i.e. $5750) will be due and owing immediately upon demand of CRST. If your employment with CRST is voluntarily *or involuntarily* terminated, any remaining balance owed under the Note will be due and owing immediately upon demand of CRST. (emphasis added)

63.     Thus, CRST isolates potential drivers and pressures them to drive with the threat of involuntary termination and debt collection.

64.     Termination, or failure to pass the CDL, would result in not only the Plaintiff Drivers having to pay back the funds on demand, if the debt went to a collections agency, they would have to pay *25% more as penalty* or the "maximum percentage permitted by applicable law." Agreement Para. 15.

65.     The Agreement gets worse. Plaintiff Drivers were not allowed to work for anyone else. Paragraph 7 of the Agreement states:

In exchange for CRST advancing the costs of the Program and other valuable consideration, You agree that you will not, without the written authorization of CRST, for a period of ten (10) calendar months after completion of the Program (the "Non-Compete Term") use the licensure You obtained as a result of the training obtained under this Agreement to provide driving services to any person or entity competing with CRST.

66.     Paragraph 8 of the Agreement states:

9

CRST shall be entitled to payment by You for all costs and expenses, including reasonable attorney fees, incurred by CRST in enforcing any provision of this Agreement. CRST shall also be entitled to pursue any other remedy available at law, including legal remedies available against any person or company who hires You in violation of this Non-Compete Agreement.

67.    Paragraph 9 of the Agreement allows CRST to hold the CDL certification of completion hostage and not provide it to drivers until they "have fully satisfied [their] repayment obligation to CRST, as set forth above," thus preventing them from working for other trucking companies and in that way forcing their labor for CRST.

68.    Amazingly, Paragraph 17 of the Agreement provides that, if a driver does not inform CRST of a change of cell phone number, the driver must indemnify CRST for CRST's violations of the Telephone Consumer Protection Act, including CRST's attorneys' fees!

69.    And to ensure that it is impossible for a driver to ever challenge this unconscionable Agreement as a contract for forced labor or in violation of the FLSA, Paragraph 13 says that the signatory "expressly waives [their] ability to bring or maintain a class action or similar proceeding against CRST."

70.    Reliant on CRST for food and lodging, with no other employment, forbidden to work with other trucking companies and now in debt over five thousand dollars, Mr. Cheatham and other drivers, sequestered far from home, signed the Agreement, subject to one final unconscionable indignity:

You acknowledge that you have had the opportunity for your own legal counsel to review this Agreement before signing.

71. Once Plaintiff Drivers had signed the Agreement, they were under the constant threat of abuse of legal process, CRST even forcing the Plaintiff Drivers to pay to defend CRST for its own illegal activity.

72. Such abuse of legal process is also apparent in the Promissory Note With Demand Feature, also signed March 28. 2022 ("Note").

73. The Demand feature of the Note set out in paragraph 3 allows CRST to demand payment in full from Plaintiff Drivers at any time for reasons completely and solely in CRST's control.

74. After signing the Agreement and the Note, Mr. Cheatham and the other Plaintiff Drivers completed the CDL training.

### *Driving For CRST*

75. Mr. Cheatham began working for CRST the week of June 19, 2002.

76. On June 21, 2022, CRST provided Mr. Cheatham a "CRST Expedited Solutions Wage Verification" ("Verification").

77. The Verification indicated that he would be making $0.36/mile

78. Like all other newly qualified drivers at CRST indebted to them, he was required to team drive.

79. Mr. Cheatham began team driving under a schedule of a truck "always moving." For six days, he would be in the truck nearly twenty-four hours a day. He would drive for eleven hours, be awake for five hours ("transition time") and be in his bunk for eight hours ("bunk time").

80. This was the pattern of driving for the Plaintiff Drivers.

81.    CRST was obligated to compensate Mr. Cheatham and the Plaintiff Drivers for all of their time except for the eight hours bunk time–sixteen hours a day.

*CRST Expedited Solutions Wage Verification*

82.    On June 21, 2022, as part of On-Boarding, Mr. Cheatham signed the CRST Expedited Solution Wage Verification ("Wage Verification").

83.    The Wage Verification is a self-contradictory document but confirms that as a new driver, Mr. Cheatham will receive $0.36 per mile.  On the Wage Verification Form, Mr. Cheatham put an x by the box that indicated:

> I am a new driver who has signed a Financial Agreement in school.  I will be in the CRST training program with a Driver Mentor.  My wage rate will be .36 cents per mile. I will split miles with my Mentor and/or Co-driver.

84.    That was the first time, when it was too late to back out, that Mr. Cheatham was given a vague, confusing hint that the $0.36 may not be all his.

*Actual Wages*

85.    However, when Mr. Cheatham referred to the Expedited Pay Scale in the Wage Verification, the amount that the Mentor would 'split' is not revealed, and only has an "X."

86.    It was therefore reasonable for Mr. Cheatham to continue to believe that he would be receiving $0.36 per mile less his 0.03 repayment.

87.    However, when Mr. Cheatham received his first pay, he found out--for the first time--that he would be paid not $0.36 or $0.33 per mile but $0.12.

88.    Mr. Cheatham therefore was paid around $5.00/hour.

89.    Mr. Cheatham drove for CRST for about four months but could not make enough money to provide for his family.

90. CRST kept his last pay in its entirety as "repayment."

91. CRST kept all ex-employee Plaintiff Drivers' last pay as "repayment" if they had received their training through CRST.

92. CRST pursued Plaintiff and all Plaintiff drivers for repayment.

93. CRST collected the total amount owed from Mr. Cheatham, so he paid the total of $5,750.00.

94. CRST pursued all drivers who left their employment and still "owed" them money.

95. That pursuit was abuse of legal process.

## CLASS ACTION ALLEGATIONS

## Based On Iowa Law and TVPA

96. Plaintiff incorporates and realleges all paragraphs above.

97. Plaintiff Drivers bring a nationwide class action on behalf of themselves and all other similarly situated members of the Class who have been similarly deprived of rights under the TVPA Iowa law by Defendants in the manner described in this Complaint. The Class that Plaintiffs seek to represent is composed of and defined as:

> All persons who are or have been an employee driver for CRST in the United States under a Commercial Driver's License Training and Repayment Agreement or similar written contract for training and employment ("Drivers") during the period commencing five (5) years prior to the filing of the Complaint through trial in this action.

98. At all relevant times, Plaintiff and Class Members were each an "employee" within the meaning of Iowa law. See I.C.A. § 91A.2(3)(a).

99. At all relevant times, Defendants were "employers" of Plaintiff and Class Members within the meaning of Iowa law. See I.C.A. § 91A.2(4).

100. Plaintiff reserves the right to modify or redefine "Class Members" for purposes of this action and to add subclasses as appropriate based on further investigation, discovery, and theories of liability.

101. Class treatment of National Class Members is appropriate under Rule 23 for the following reasons:

A. Numerosity: Class Members are so numerous that joinder would be impractical, and the disposition of their claims on a class (rather than individual) basis will conserve resources of the parties and judicial system. While the number of Class Members is unknown at this time, this information can be readily ascertained from Defendants' business records. Upon information and belief, Defendants employ, or have employed, over one thousand Class Members during the Class Period.

B. Commonality: Common questions of law and fact exist and predominate as to Plaintiff and Class Members, including, but not limited to:

i. Whether Defendants' treatment of Plaintiff and Class Members constituted "involuntary servitude" under 22 U.S. Code § 7102.8(a).

ii. Whether the Agreement, Note, and other documentation constituted "threatened abuse of the legal process" under 22 U.S. Code § 7102.1.

iii. Whether Defendants' collection efforts constituted "abuse of the legal process" under 22 U.S. Code § 7102.1.

iv. Whether Defendants fraudulently misrepresented the terms and conditions of Plaintiff Drivers' employment prior to Plaintiff Drivers commencing training.

v. Whether Defendants were unjustly enriched by charging Plaintiff Drivers $5,750 (or near that) for their CDL training.

vi. Whether Defendants were unjustly enriched by charging Plaintiff Drivers for drug tests in violation of I.C.A. § 730.5 .

vii. Whether Defendants were unjustly enriched by withholding Plaintiff Drivers' wages without lawful purpose in violation of I.C.A §91A.(1)5

viii. Whether Defendants were unjustly enriched by charging Plaintiff Drivers in excess of $20 for their relocation in violation of .I.C.A § 91A.5(2)(g)

ix. Whether Defendants failed to pay Plaintiff Drivers minimum wage in violation of I.C.A. §91D *et seq*

C. Typicality: Plaintiff's claims are typical of the claims of Class Members because Plaintiff and Class Members were subject to the same employment policies and practices of Defendant during the Class Period, and each sustained damages. Proof of a common or single state of facts will therefore establish the right of Plaintiff and Class Members to recover.

D. Adequacy: Plaintiff will fairly and adequately represent the interests of Class Members because Plaintiff is a Class Member and has the same legal and factual issues as Class Members and has no interests antagonistic to Class

Members. Plaintiff has retained both local and national legal counsel competent and experienced in class actions, including labor and employment litigation. Plaintiff and his counsel are aware of their fiduciary responsibilities to Class Members and are determined to discharge those duties diligently by vigorously seeking the maximum possible recovery for Class Members.

E. Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Plaintiff and each Class Member has been damaged and is entitled to recovery by reason of Defendants' violations of the Trafficking Victims Protection Act; illegal failure to pay Class Members minimum wage in violation of Iowa wage-and-hour law; Defendants' fraudulent misrepresentations inducing Class Members to enter into forced labor, and Defendants' unjust enrichment by overcharging for training and making illegal deductions to Class Members' pay. Class action treatment will permit a relatively large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense. Furthermore, the prosecution of individual lawsuits by each Class Member would present the risk of inconsistent and contradictory judgments, along with the potential for establishing inconsistent standards of conduct for Defendant and other state employers. Consequently, an important public interest will be served by addressing this matter as a class action.

## FLSA COLLECTIVE ALLEGATIONS

102. Plaintiff incorporates and realleges all paragraphs above.

103. Plaintiff brings this action on behalf of himself and Federal Class Members as a collective action pursuant to 29 U.S.C. § 216(b).

104. Class Members are similarly situated to Plaintiff, and vice versa.

105. Plaintiff is similarly situated to Class Members based on the same factors of commonality, typicality, and adequacy enumerated above.

106. At all relevant times, Plaintiff and Class Members were each an "employee" within the meaning of the FLSA. See 29 U.S.C. § 203(e), (g).

107. At all relevant times, Defendants were "employers" of Plaintiff and Class Members within the meaning of the FLSA. See 29 U.S.C. § 203(d), (g).

108. Plaintiff reserves the right to modify or redefine "FLSA Collective Members" for purposes of this action and to add subclasses as appropriate based on further investigation, discovery, and theories of liability.

109. Pursuant to 29 U.S.C. § 216(b), Plaintiff has filed his consent to join this FLSA collective action as of September 27, 2024. See attached Exhibit A.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Fraudulent Misrepresentation

### (On Behalf of Plaintiff and the Class)

110. Plaintiff incorporates and realleges all paragraphs above.

111. CRST represented to Plaintiff and Plaintiff Drivers that they would make $0.36/mile if they trained at a CRST school and drove with CRST.

112. CRST represented to Plaintiff and Plaintiff Drivers that their training would be "sponsored."

113. CRST knew or should have known that "sponsored" meant, to the average listener, that CRST would pay for the training.

114. CRST knew that Plaintiff and Plaintiff Drivers would not earn $0.36/mile when that representation was made.

115. CRST intended to deceive Plaintiff and Plaintiff Drivers that they would earn $0.36/mile.

116. CRST intended to deceive Plaintiff and Plaintiff Drivers that they would not have to pay CRST back for the training.

117. Plaintiff and Plaintiff Drivers did not make $0.36/mile.

118. Plaintiff and Plaintiff Drivers were obligated to repay CRST.

119. The representation that Plaintiff and Plaintiff Drivers would make $0.36 was material to their decision to work for CRST.

120. The representation that Plaintiff and Plaintiff Drivers would have their training "sponsored" was material to Plaintiff and Plaintiff Driver's decision to attend training.

121. Plaintiff and Plaintiff Drivers acted in reliance on CRST representations about pay.

122. Plaintiff and Plaintiff Drivers acted in reliance on CRST representations about sponsoring their training.

123. CRST intended to deceive the Plaintiff and Plaintiff Drivers until the Plaintiff and Plaintiff Drivers had no real way to back out of the forced labor.

124. CRST's misrepresentations were the proximate cause of Plaintiff and Plaintiff Driver's damages. Plaintiff and Plaintiff Drivers were damaged.

125. Plaintiff and Plaintiff Drivers were damaged in an ascertainable amount.

**WHEREFORE,** Plaintiff and Class Members demand payment by Defendants of their benefit-of-the-bargain damages and all other consequential damages, together with attorney's fees, costs, and interest as provided by law.

## SECOND CAUSE OF ACTION

### Deduction from wages in violation of I.C.A. § 91A.5(1)

### (On Behalf of Plaintiffs and the Class)

126. I.C.A §91A.5(1) provides that employers may not withhold employee's wages unless there is a lawful purpose accruing to the benefit of the employee.

127. The lawful purpose of training the employee to pass the CDL should be valued at the amount CRST paid to the driver school, which is not known now but upon information and belief is $1,500.

128. The remaining amount paid back by Plaintiff and Plaintiff Drivers, which constitutes profit to CRST, should be refunded.

**WHEREFORE,** Plaintiff and Class Members demand payment by Defendants for all deductions made to their pay and damages due under I.C.A. § 91A.8, including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages" and interest as provided by law.

## THIRD CAUSE OF ACTION

### Deduction from wages in violation of I.C.A. § 91A.5(2)(g)

#### (On Behalf of Plaintiffs and the Class)

129.    CRST charged Plaintiff and Plaintiff Drivers for "transportation to the training school, lodging during training, up to two meals/day during training, physical, and drug tests."

130.    These charges were relocation expenses.

131.    I.C.A. § 91A.5(2)(g) provides that employers may not charge employees for relocation in amounts greater than $20.

**WHEREFORE**, Plaintiff and Class Members demand payment by Defendants for all deductions made to their pay and damages due under I.C.A. § 91A.8, including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages" and interest as provided by law.

## FOURTH CAUSE OF ACTION

### Deduction from wages in violation of I.C.A. § 730.5(6)(b)

#### (On Behalf of Plaintiffs and the Class)

132.    I.C.A. § 730.5(6)(b) provides that "an employer shall pay all actual costs for drug or alcohol testing of employees and prospective employees required by the employer."

133.    CRST charged Plaintiff and Plaintiff Drivers for drug tests.

134.    The amounts that CRST charged Plaintiff and Plaintiff Drivers for drug tests should be refunded.

**WHEREFORE**, Plaintiff and Class Members demand payment by Defendants for all deductions made to their pay for drug tests and damages due under I.C.A. § 730.5(15)(a)(1) ("other equitable relief as the court deems appropriate including attorney fees and court costs").

## FIFTH CAUSE OF ACTION

### Forced Labor in Violation of the Trafficking Victims Protection Act
### 18 U.S.C. § 1589

### (On Behalf of Plaintiff and the Class)

135. Plaintiff incorporates and realleges all paragraphs above.

136. The "fundamental purpose" of the Trafficking Victims Protection Act is to "reach cases of servitude achieved through . . . threatened abuse of legal process."

137. Under 18 U.S.C. § 1589(a)(3), a plaintiff must show that the defendant "knowingly provide[d] or obtain[ed]" plaintiff's labor or services by means of . . . (3) "abuse or threatened abuse of law or legal process."

138. 18 U.S.C.A. § 1595 provides that "an individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorney fees."

139. CRST obtained the services of Mr. Cheatham and Plaintiff Drivers by transporting them to a location away from their homes with fraudulent misrepresentations and then forcing them to sign a Repayment Agreement that was replete with threats of legal process against Plaintiff Drivers for failing to drive with CRST, failure to pay the

excessive debt and failure to adhere to the illegal non-competition clause in the Agreement.

**WHEREFORE**, Plaintiff and Class Members demand damages and reasonable attorneys' fees together with costs and interest as provided by law.

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of Plaintiffs and the Class)

140.    Plaintiff incorporates and re-alleges all paragraphs above.

141.    CRST was enriched by the repayment by Plaintiff and Plaintiff Drivers of a debt that in large part should not have existed.

142.    In particular, the penalty charge of $2,750 constitutes unjust enrichment of CRST.

143.    In particular, the difference between the actual cost to CRST of driver training and the $3,000 base charge for the training constitutes unjust enrichment of CRST.

144.    Plaintiff and Plaintiff Drivers earned funds that were kept by CRST or collected by CRST at the expense of the Plaintiff and Plaintiff Drivers.

145.    It is unjust to allow CRST to retain the benefit of repayment in this circumstance.

## SEVENTH CAUSE OF ACTION

### Failure to Pay Minimum Wages in Violation of I.C.A. § 91D.1, *et seg.*

### (On Behalf of Plaintiff and the Class)

146.    Plaintiff incorporates and realleges all paragraphs above.

147. I.C.A. § 91D.1 requires that each employer pay to its employee the state hourly wage, which since 2008 has been $7.25 for each compensable hour they spend at the employer's behest.

148. CRST had Plaintiff and Plaintiff Drivers working in teams and spending nearly twenty-four hours a day in a truck for six days per pay period.

149. CRST had an obligation to compensate Plaintiff and Plaintiff Drivers for eleven hours of drive time, three hours of transition time and two hours of non-berth time, for a total of sixteen hours per twenty-four-hour period they were on the road.

150. CRST intentionally compensated Plaintiff and Plaintiff drivers at a rate that fell below minimum wage for each hour of compensable time.

151. CRST intentionally paid Plaintiff Drivers well below the state hourly wage.

**WHEREFORE**, Plaintiff and Class Members demand payment by Defendants at the regular hourly pay rate for Drivers or the minimum wage rate, and damages due under I.C.A. § 91A.8, including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages" and interest as provided by law.

## EIGHTH CAUSE OF ACTION

### Failure to Pay Minimum Wages in Violation of the FLSA, 29 U.S.C § 206

#### (On Behalf of Plaintiff and the FLSA Collective)

152. Plaintiff incorporates and realleges all paragraphs above.

153. Under the FLSA, "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of

goods for commerce, wages at the [federal minimum wage rate] . . . ." 29 U.S.C. § 206(a)(l).

154.    By paying newly qualified employee drivers $0.12/mile for sixteen-hour days of compensable work time, Defendants failed to pay Plaintiff and Collective Members at least federal minimum wage as required by the FLSA.

**WHEREFORE**, Plaintiff and Collective Members demand payment by Defendants at the federal minimum wage rate for all hours worked during the FLSA Period, plus an additional equal amount as liquidated damages, together with attorney's fees, costs, and interest as provided by law.

<u>**ADDITIONAL PRAYER FOR RELIEF**</u>

**WHEREFORE** Plaintiff, individually and on behalf of Class and Collective Members and all others similarly situated, prays for relief as follows:

1.      For an order certifying this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class of Drivers;

2.      For an order conditionally certifying this action as a collective action under the FLSA on behalf of the Collective Class;

3.      For an order appointing Plaintiff as representative and his counsel as class counsel for the Class and FLSA Collective;

4.      For damages, according to proof for the regular rate of pay under applicable state or federal law for all hours worked;

5.      For liquidated damages and attorneys' fees according to proof for the minimum wage rate under I.C.A. § 91A.8;

6.      For wages or expenses that were intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages ;

7.      For liquidated damages, pursuant to 29 U.S.C. § 216(b);

8.      For interest as provided by law at the maximum legal rate;

9.      For reasonable attorneys' fees authorized by federal law, Iowa law, common law, or equity;

10.     For costs of suit incurred herein;

11.     For pre-judgment and post-judgment interest at the maximum legal rate;

12.     For such other relief as the Court may deem just and proper.


NATHAN WILLEMS, AT0009260
EMILY SHOTT HOOD, AT0014444
RUSH & NICHOLSON, P.L.C.
115 First Avenue SE, Suite 201
P.O. Box 637
Cedar Rapids, IA 52406-0637
Telephone (319) 363-5209
Facsimile (319) 363-6664
nate@rushnicholson.com
emily@rushnicholson.com

/s/ Rachel Mariner
Rachel Mariner, *pro hac vice anticipated*
RAFII & ASSOCIATES, P.C.
1120 North Town Center Dr., Suite 130
Las Vegas, NV 89144
Telephone (725) 245-6056
Facsimile (725) 220-1802
rachel@rafiilaw.com

ATTORNEYS FOR PLAINTIFF AND
THE PROPOSED CLASS