## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| CHRISTOPHER CHEATHAM, on behalf of himself and all others similarly situated,<br><br>       Plaintiff,<br><br>       v.<br><br>CRST INTERNATIONAL HOLDINGS, LLC; CRST EXPEDITED, INC, d/b/a CRST THE TRANSPORTATION SOLUTION, INC.,<br><br>       Defendants. | Case No. 1:24-CV-109 |

## PLAINTIFF'S MOTION FOR LEAVE TO AMEND FIRST AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Christopher Cheatham respectfully moves the Court for leave to amend his First Amended Complaint ("FAC"). The proposed Second Amended Complaint ("SAC") is attached to this Motion as **Exhibit A**. Attached as **Exhibit B** is a redlined comparison of the First Amended Complaint with the proposed Second Amended Complaint.  LR 15.

Also pursuant to Local Rule 15, Plaintiff seeks declaratory and injunctive relief against both Defendants, CRST Expedited, Inc ("CRST Expedited") and CRST International Holdings LLC ("CRST Int'l") based on allegations already existing in the FAC, including a declaration that the alleged "Class Action Waiver" in the CRST Commercial Driver's License Training and Repayment Agreement ("Repayment Agreement") (Ex. B to ECF 36):  (a) is unenforceable as to any classes that may be certified in this action because it is unconscionable; and (b) is inapplicable to the FLSA Collective.

Pursuant to Local Rule 7(k), Plaintiff's counsel reports she has conferred in good faith with counsel to CRST Expedited and CRST International and the Defendants' counsel do not consent to the motion. More specifically, Plaintiff sought to extend the deadline in the Scheduling Order and Discovery Plan (ECF43) to amend current pleadings from today, April 30, 2025, until after the pending Renewed

Motions for Judgment on the Pleadings (ECF 55 and ECF 56; "MJOPs"). Plaintiff sought the extension to avoid disrupting the completed briefing on the MJOPs in what she thought was Defendants' preference. However, counsel for Defendant would only agree to an extension of time if Plaintiff, *inter alia,* did not add new claims (among other conditions). Plaintiff therefore files the instant motion to amend.

As set out more fully in the Memorandum of Points and Authorities, Plaintiff's addition of declaratory and injunctive relief will not moot the MJOPs but will contribute to the efficient and judicious resolution of this matter. Finally, Plaintiff has also removed the sentence in ¶100 pursuant to the Magistrate Judge's Order (ECF 69).

For the foregoing reasons, and those set out in the Memorandum of Points and Authorities attached hereto, Plaintiff respectfully moves the Court for leave to file the Second Amended Complaint.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE FIRST AMENDED COMPLAINT

### I.     INTRODUCTION

Because Plaintiff is within the court-imposed deadline for amending his Complaint, the Rule 15 standard of "freely given to promote justice" applies, rather than the "stricter standards" of Rule 16. *See Midwest Medical Solutions, LLC v. Exactech U.S., Inc.*, 95 F.4th 604, 607 (8th Cir. 2024); Scheduling Order (ECF 43). Plaintiff's proposed amendment adding a request for declaratory and injunctive relief will clarify and settle the legal relations at issue and is therefore appropriate. *See Scottsdale Ins. Co. v. Detco Industries Inc.* 426 F. 3d 994, 998 (8th Cir. 2005) (reversing district court's dismissal of a declaratory judgment claim when declaratory judgment would clarify and settle questions of law in multiple class action lawsuits).

### II.     PROCEDURAL BACKGROUND

The Parties submitted their Joint Scheduling Order and Discovery Plan on February 7, 2025 to Magistrate Judge Roberts' chambers wherein both parties agreed that the deadline for motions to amend pleadings (*without leave of court*) would be April 30, 2025. The Magistrate Judge amended the joint

2

submission and set April 30, 2025 as the deadline for amending pleadings by motion (ECF 43). Plaintiff's instant motion therefore conforms to the Scheduling Order.

Defendants have filed Renewed Motions for Judgment on the Pleadings ("MJOPs") in response to the FAC. In these MJOPs, CRST Int'l seeks dismissal from this action despite admitting in its Answer that it is the FLSA Employer (ECF 52, ECF 56). CRST Expedited seeks partial judgment (heavily reliant on the class action waiver described *infra*) but does not seek dismissal of the FLSA claim against it (ECF 55). Plaintiff's Motion for Notice to the Collective under the FLSA is fully briefed (ECF 44, 53, 58).

All of these motions are stained by the alleged Class Action Waiver in the Repayment Agreement (CRST Commercial Driver's License Training and Repayment Agreement ("Repayment Agreement") (Ex. B to ECF 36)). Orderly resolution of this matter is served by Plaintiff seeking declaratory and injunctive relief against certain unlawful contractual provisions already identified in the FAC, including the purported "Class Action Waiver". All outstanding motions are centered on the waiver and its enforceability as to classes that may be certified in this matter and the FLSA Collective for which Plaintiff has moved for notice. Declaratory and injunctive relief cuts across all three[1] motions and clarifies the rights and obligations of the parties under the Repayment Agreement described in the FAC and appended to CRST Expedited's MJOP (Ex B to ECF 55). This proposed amendment does not disturb the MJOPs as the contents of the First Amended Complaint are merely supplemented, not changed. The orderly consideration of the unconscionability and unenforceability of the alleged class action waiver in the Repayment Agreement is not for an MJOP (where unconscionability requires consideration of disputed facts) and not for a Motion for Notice to the Collective (which is procedural and not a ruling on the merits of the underlying FLSA claim). It should be properly before the Court in seeking declaratory and injunctive relief and therefore Plaintiff seeks to amend.

---

[1] Four motions if Defendants' pending Motion to Strike is included. Currently pending is Defendants' Motion to Strike Plaintiff's Reply in Support of his Motion for Notice to the Collective. Defendants' Motion to Strike is at least partially based on Plaintiff's response to Defendants' factual claims of enforceability of the alleged "class action waiver" with evidence from Defendants of procedural unconscionability (ECF 60). The Motion to Strike underscores the need for declaratory and injunctive relief.

## III.  ARGUMENT

### A.  Plaintiff Is Within Rule 15(a)'s Liberal Amendment Standard.

Rule 15(a)(2) of course states "the court should freely give leave [to amend] when justice so requires." The Eighth Circuit requires leave to amend to be granted "unless there is a good reason for denial, "such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment" *Becker v. University of Nebraska at Omaha*, 191 F.3d 904, 907-908 (8th Cir. 1999) citing *Brown v. Wallace,* 957 F.2d 564, 566 (8th Cir.1992).

No such good reason permits denial of this motion to amend. First, there is no undue delay, as this motion is made within the time permitted in the Scheduling Order. Second, there is no bad faith or dilatory motive, nor can any be imputed from the timing. *Cf. Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 225-227 (8th Cir. 1994) (affirming district court's denial of leave to amend when "the motion to amend is made on the eve of trial and will cause prejudice and further delay," and "[plaintiff] and her counsel were dilatory throughout the pendency of this action"). Here, the close of discovery is scheduled for August 31, 2025 and the trial ready date is October 8, 2026 (ECF 43).

Leave to file the Second Amended Complaint cannot be denied because the single previous amendment "failed to cure deficiencies" at this early stage. There are no rulings on any deficiencies existing in the First Amended Complaint. Further there is no prejudice to the non-moving party. The facts under which Mr. Cheatham seeks declaratory and injunctive relief are not new, and the Eighth Circuit has made clear that "[w]here the facts on which a previously unasserted claim is based are all known or available to all parties, there is no prejudice in allowing an amended complaint." *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690 (1981).

4

Finally, the amendment is not futile. Declaratory relief can "serve a useful purpose in clarifying and settling the legal relations in issue." *Karsjens v. Jesson,* 6 F.Supp. 3d 958, 973 (D. Minn. 2014) (citing *Alsager v. Dist. Ct. of Polk Cnty., Iowa (Juvenile Div.),* 518 F.2d 1160, 1163–64 (8th Cir.1975) (quoting E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941)). In ruling on the instant motion, it matters not whether Plaintiff's request for declaratory and injunctive relief will ultimately be granted. A motion to amend cannot be denied "based, in part, on a perception that the plaintiffs were unlikely to succeed on the merits of their claim." *Buder* at 695.

The distinction between "futile" and the mere possibility that this Court may decline to declare the rights of litigants is set out clearly in *Cortez-Melon v Capital One Finance Institution* 2019 WL 12073968 (E.D. Va), an FLSA collective action. In *Cortez-Melon*, the district court permitted an amendment of the complaint to (a) add a defendant; (b) separate collective and individual claims; and (c) add "a Declaratory Judgment on the issues of whether an employee's right to collective action under section 216(b) of the FLSA can be waived by a severance agreement alone, or whether the Letter of Agreement so waives those rights." *Id.* *2. The amendment was permitted while a motion to dismiss was pending. *Id.* Defendants argued that the declaratory judgment amendment to the claim was "inappropriate" and "duplicative" and pointed out Fourth Circuit cases where declaratory judgment relief was not ultimately granted. The district court rejected those objections to amendment:

> [T]he mere possibility—or even the likelihood—that this Court may, at a later date, exercise its "unique and substantial discretion" and decline to "declare the rights of litigants" does not render the proposed amended complaint legally insufficient on its face. … In other words, [Defendant] raises the possibility that [Plaintiff's] Declaratory Judgment Claim will fail on the merits, not that it is clearly futile

*Id.* *3.

## B. Declaratory Relief Is Appropriate To Determine The Enforceability of a Non-FAA Alleged Class Action Waiver

Courts "may render a declaratory judgment "(1) when the judgment will serve a useful purpose in

5

clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Karsjens v. Jesson,* 6 F.Supp. 3d 958, 973 (D. Minn. 2014) (citing *Alsager v. Dist. Ct. of Polk Cnty., Iowa (Juvenile Div.),* 518 F.2d 1160, 1163–64 (8th Cir.1975) (quoting E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941)).

Courts in the Eighth Circuit regularly deploy declaratory judgments in class action proceedings. *See Walls v Sagamore Ins. Co.,*274 F.R.D. 243, 256 (2011) *("*there is no valid dispute that … declaratory relief on a class-wide basis is appropriate in this case."); *Taqueria El Primo v. Illinois Farmers Insurance,* 577 F.Supp.3d 970 (D.Minn. 2021) (certifying a Fed. R. Civ. P. 23(b)(2) injunctive class when plaintiff demonstrated "… declaratory relief is appropriate respecting the class as a whole"). Mr. Cheatham is not now seeking an injunctive class. Mr. Cheatham has, however, defined the FLSA Collective as those who signed the Repayment Agreement, which contains the alleged class action waiver. Defendants have informed Plaintiff that two thousand five-hundred fourteen team drivers signed the Repayment Agreement. (Decl. of Rachel Mariner in Support of Motion for Circulation of Notice ¶31 (ECF 58-2 ¶31)). They are equally and uniformly affected by the class action waiver as it is deployed or severed in this lawsuit and thus declaratory or injunctive relief may be appropriate as discovery unfolds.

Where, as here, alleged "class action waivers" are used defensively to stop an entire action in its tracks and where, as here, the inapplicability of of the Federal Arbitration Act allows the Court to follow Iowa State law, it is particularly appropriate to permit Plaintiff's amendment in favor of seeking declaratory and injunctive relief. *See C&J Fertilizer Inc. v Allied Mutual Ins. Co.,* 227 N.W.2d 169, 180-181 (Iowa Sup. Ct. 1975) (finding a standard contract unconscionable and noting with approval that the Second Restatement of Contracts "*permits the court to pass directly* on the unconscionability of the contract or clause rather than to avoid unconscionable results by interpretation…. the court may refuse to enforce an unconscionable provision and may give such remedy as justice requires") (emphasis added); *see also Woods v. QC Financial Services, Inc.*, 280 S.W.3d 90 (Miss. Ct. App. 2008) (affirming declaratory judgment sought by class action plaintiff and granted by trial court that

6

prohibition of class arbitration was unconscionable; further affirming trial court's severing of the unconscionable portion of contract); *see also Montoya v. CRST Expedited, Inc.*, No. CV 16-10095-PBS, 2020 WL 2850235, at *1–2 (D. Mass. June 2, 2020) (granting injunctive relief on CRST's enforcement of non-competition provisions in drivers' contracts and related debt collection practices).

## IV.    CONCLUSION

For all the foregoing reasons, Plaintiff respectfully requests that the Court grant leave to amend.

Respectfully submitted,

DATED: April 30, 2025

*/s/Rachel Mariner*
Rachel Mariner
RAFII & ASSOCIATES, P.C.
1120 N. Town Center Dr., Suite 130
Las Vegas, NV 89144
Tel: (725) 245-6056
rachel@rafiilaw.com
*Attorneys for Plaintiff*

Nathan Willems
Emily Shotthood
RUSH & NICHOLSON, P.L.C.
Tel: (319) 363-5209
nate@rushnicholson.com

7

**CERTIFICATE OF SERVICE**

I hereby certify that on the April 30, 2025, I caused service of a true and correct copy of the foregoing **MOTION FOR LEAVE TO AMEND FIRST AMENDED COMPLAINT, SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES, EXHIBIT A - [PROPOSED] SECOND AMENDED COMPLAINT, and EXHIBIT B - LR 15 REDLINE OF FIRST AND SECOND AMENDED COMPLAINT** to be made by Odyssey E-file & Serve program, upon all parties registered to use this service, and listed as electronic service recipients herein, Email and/or via U.S. mail.

James H. Hanson
Angela S. Cash
Andrew J. Ireland
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
jhanson@scopelitis.com
acash@scopelitis.com
aireland@scopelitis.com

Kevin J. Visser
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
kvisser@spmblaw.com
*Attorneys for Defendants CRST International Holdings, LLC*

                                        */s/ Marcus Johnson*
                                        An employee of RAFII & ASSOCIATES, P.C.

8

# EXHIBIT A

# EXHIBIT A

# UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

| | |
|---|---|
| CHRISTOPHER CHEATHAM, on behalf of himself and all others similarly situated, <br><br> V. <br><br> CRST INTERNATIONAL HOLDINGS, LLC; CRST EXPEDITED, INC, d/b/a CRST THE TRANSPORTATION SOLUTION, INC. <br><br> Defendants. | Case No. 1:24-CV-109 <br><br> **SECOND AMENDED COMPLAINT** |

Plaintiff CHRISTOPHER CHEATHAM, individually and on behalf of all other persons similarly situated, by his undersigned attorneys as and for the Class Action and Collective Action alleges as follows:

## **INTRODUCTION**

1. This is a class and collective action for fraudulent misrepresentation, breach of contract, unjust enrichment, forced labor, unpaid wages, liquidated damages, statutory fines, declaratory and injunctive relief, attorneys' fees and costs, and interest under the Iowa Code Annotated ("I.C.A."), Iowa common law, the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.,* and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

2. Plaintiff Christopher Cheatham ("Mr. Cheatham" or "Plaintiff") is one of many people ("Plaintiffs" or "Plaintiff Drivers") recruited under false pretenses to receive training for a Commercial Driver's License ("CDL") and then forced by debt and threatened abuse of legal process to drive for CRST International Holdings LLC., through its wholly-owned and controlled subsidiary CRST Expedited ("CRST") even though their compensation per hour was less than minimum wage, and even though CRST deducted a handsome profit margin for itself from their wages.

1

3.     Specifically, Plaintiff Drivers allege that (a) CRST made fraudulent representations, using false and misleading phone calls and advertising to induce drivers to enter into CRST's Commercial Driver's License Training and Repayment Agreement or similar arrangement; (b) CRST breached the its promise to pay 0.36/mile as set out in the CRST Expedited Solutions Wage Verification and its promise to pay minimum wage in the CRST Wage Deduction Authorization; (c) CRST was unjustly enriched by the repayment agreement they forced Plaintiff Drivers to sign; (c) CRST deducted amounts from Plaintiff Driver wages in violation of I.C.A. § 91A.5(1) and I.C.A. § 91A.5(2)(g); (d) Plaintiff Drivers were forced by debt and threat of legal process to drive for CRST in violation of the TVPA and the Iowa Human Trafficking Law; (e) CRST did not pay Plaintiff Drivers minimum wage for the hours they were due compensation in violation of Iowa law; (e) CRST did not pay Plaintiff Drivers minimum wage for the hours they were due compensation in violation of the FLSA.

4.     All allegations in this Complaint are based on information and belief except for those allegations pertaining specifically to Plaintiff, which are based on his personal knowledge. Each allegation in this Complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## PARTIES

5.     At all relevant times, Plaintiff CHRISTOPHER CHEATHAM ("Plaintiff" or "Mr. Cheatham") was and is a natural person residing in Las Vegas, Nevada.

6.     Mr. Cheatham was an employee of CRST along with his similarly-situated co-workers subject to the class and collective action allegations of this Complaint, "Plaintiffs" or "Plaintiff Drivers."

7.     At all relevant times, Plaintiff Drivers were 'employees' for purposes of Plaintiffs' claims under Iowa Law and the FLSA in that Defendants suffered or permitted them to work. I.C.A. § 91A.2(3)(a); 29 U.S.C. § 203(e), (g).

8.     Defendant CRST International Holdings LLC is the owner of the subsidiary CRST Expedited Inc also named as Defendants.

9.     Defendant CRST International Holdings LLC controlled the policies and procedures of its subsidiaries.

2

10.     Defendant CRST International Holdings LLC shares corporate headquarters with Defendant CRST Expedited at 3630 16th Avenue SW, Cedar Rapids, Iowa.

11.     Harald Smith started CRST as a trucking company in 1971.

12.     John Smith, Herald Smith's son is the Chairman of the Board of CRST International Holdings, LLC.

13.     John Smith describes CRST International Holdings LLC as "a national truckload and flatbed carrier" in his American Trucking Associations Biography.

14.     CRST is owned by John Smith; his wife, and their three children. The ownership structure involves one holding company CRST International Holdings LLC that owns the family's main trucking and logistics company, CRST Expedited.

15.     Defendants CRST Expedited, Inc. does business as CRST The Transportation Solution, Inc.

16.     Collectively, both CRST entities herein, ("CRST" or "Defendants") are privately owned companies owned and operated by related individuals and entities for a common business purpose: transportation of freight for CRST customers.

17.     Defendant CRST Expedited, Inc. entered into the CRST Commercial Driver's License Training and Repayment Agreement with Plaintiff.

18.     Defendants have thousands of employee drivers and ex-drivers and people who signed the CRST Commercial Driver's License Training and Repayment Agreement or were subject to a substantially similar scheme.

19.     Defendants with their sister and subsidiary companies have annual revenue in excess of $1.7 billion.

## JURISDICTION AND VENUE

20.     Plaintiff incorporates and realleges all paragraphs above.

21.     Because Plaintiff's FLSA claim and TVPA claim arise under federal law, the Court has federal question jurisdiction pursuant to 28 U.S.C §1331.

22.     In addition, the Court has supplemental jurisdiction over Plaintiff's Iowa state-law claims

3

under 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative fact regarding Defendant's unlawful treatment of Plaintiff, and form part of the same case and controversy.

23.     Venue is proper in this Court because Defendants are headquartered and operate within this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. See 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

24.     CRST is in constant need of long-haul team drivers, an unpopular and grueling position.

25.     CRST fills this need with a plan to force labor set out herein.

26.     CRST induces vulnerable individuals - people who have never been truckers before and therefore don't know better - by means of high-pressure phone calls, print, radio, television and internet advertising to drive for them.

27.     CRST's key point in recruiting individuals is that they will change their life and earn a good wage.

28.     CRST knew or had reason to know that it would in fact overcharge drivers for their training and pay them less than minimum wage.

*Mr. Cheatham's Experience*

29.     Mr. Cheatham was managing a men's clothing store in Las Vegas, Nevada at the beginning of 2022.

30.     In the evenings he began searching for more long-term career prospects online.

31.     Mr. Cheatham came across CRST with its offer for "sponsored training" and input his phone number.

32.     A "Bruce" from CRST began calling Mr. Cheatham repeatedly, trying to convince him to join CRST and take advantage of the training.

33.     The person told him that this was the career he needed – that he could immediately start making money after training and that he would stay in good accommodations for training.

4

34.     Mr. Cheatham didn't have his CDL so he signed up for CRST "sponsored" training.

35.     In reliance on Bruce's representations, Mr. Cheatham quit his retail job to pursue working for CRST.

36.     CRST sent him to attend Careers Worldwide, 45 S. Main St., Keenesburg, CO 80643 for training for his CDL.

37.     At all times Careers Worldwide functioned as the agent of CRST.

38.     Mr. Cheatham had no right choose which driving school he would attend.

39.     Mr. Cheatham travelled to Keenesburg, CO.

40.     There he found out the living conditions at Careers Worldwide.

41.     For his training accommodation his entire class of adult men shared one three-bedroom condo – one bedroom held six bunks, and two held four bunks each.

42.     The overly crowded living conditions made sleeping, grooming and adequate ventilation very difficult.

43.     The trainees were not allowed to drag their mattress into the living room to get more air and space.

44.     For food, all trainee drivers were given $70 per week to purchase their own.

45.     There was a store with extortionately priced food at Careers Worldwide where $70 would not last for a week of meals.

46.     People at Careers Worldwide would charge $20 to drive trainees to Walmart to get food.

47.     None of the people in his class of trainees had assets or spare cash. One was homeless and planned to live in the truck after he started driving.

48.     Most of the people in Mr. Cheatham's class of trainees were broke.

49.     Some of the people ran out of money and went hungry during training.

50.     Mr. Cheatham's classmates were from all over. Three were from Texas, one from California, one from Kentucky.

51.     No classmates had chosen the driving school. They had been directed there by CRST.

52.     When Mr. Cheatham and his classmates arrived before training began on Monday, they were given a booklet to prepare for the learner's permit exam for CDL in Colorado.

53.     Mr. Cheatham and his classmates expected to start on the learner's permit exam in Colorado when classes started.

54.     Instead, the employees of Careers Worldwide, acting as agents of CRST, gave Mr. Cheatham and his classmates some documents.

55.     The employees of Careers Worldwide said sign these or go home.

i.      *Wage Deduction Authorization*

56.     The first was "Wage Deduction Authorization".

57.     Mr. Cheatham signed his Wage Deduction Authorization on March 28, 2022.

58.     Mr. Cheatham, now jobless and in a strange city, reliant on CRST for food and shelter, had no choice but to sign the Wage Deduction Authorization and the other documents put before him that day.

59.     Mr. Cheatham's fellow Plaintiff Drivers were similarly situated and without choice.

60.     The Wage Deduction Authorization indicates:
>      I hereby authorize CRST Inc. d/b/a CRST The Transportation Solution, Inc ("CRST") to withhold from my weekly wages the total amount equaling $0.03 per Total Movement Mile which shall be withheld for the purpose of repaying my financial obligations under my CRST Commercial Driver's License Training and Repayment Agreement (the "Agreement"). … I represent that this authorization is executed voluntarily and has not been made as a condition of my continued employment.

61.     It was not really voluntary. Mr. Cheatham and his classmates felt they had no choice but to go forward.

62.     Mr. Cheatham and his classmates did not know what Total Movement Mile meant.

63.     The Wage Deduction Authorization states "CRST may withhold the remaining amount owed from my final pay, except to the extent prohibited by federal or state minimum wage law."

64.     To the extent the Wage Deduction Authorization is enforceable, CRST breached this element of the Authorization.

ii.     *CRST Commercial Driver's License Training and Repayment Agreement and Promissory Note*

6

65. CRST, through the training school, also forced Mr. Cheatham and his classmates to sign CRST Commercial Driver's License Training and Repayment Agreement ("Agreement") in order to commence training.

66. The Agreement asserts that the cost of the training Program is five thousand, seven hundred fifty dollars ($5750.00).

67. The amount that CRST actually paid Careers Worldwide (the driving school in Keenesburg, CO) for Mr. Cheatham's and Plaintiff Driver training is unknown.

68. The amount that CRST or Careers Worldwide were compensated by third parties for Mr. Cheatham's and Plaintiff Driver training is unknown.

69. Upon information and belief, the true cost of the "CDL training school tuition" is not $5750 but as little as $1500.

70. Further CRST illegally charged Plaintiff and Plaintiff Drivers via the Agreement. Included in the $5750 that will be charged to drivers (at Para 2 of the Agreement) are:

> [t]ransportation to the training school; lodging during training, up to two meals/day during training, federally required DOT physical and DOT Drug test, hair drug test, CLP Assistance and other fees, costs and expenses incurred by CRST

71. I.C.A §91A.5 provides that employers may not withhold employee's wages unless there is a lawful purpose accruing to the benefit of the employee.

72. I.C.A §91A.5(g) provides that it is unlawful for employers to charge employees for costs of more than twenty dollars for an employee's relocation to the place of employment.

73. Because these documents constituted a contingent employment agreement, I.C.A. §91A.5(g) prohibits CRST for the charges it made to Plaintiff and Plaintiff Drivers.

74. Besides forcing Mr. Cheatham and the Plaintiff Drivers to pay costs unlawfully charged the Agreement seals Mr. Cheatham's fate. It informs Mr. Cheatham without choice that:

CRST will deduct from his paycheck $0.03 per Total Movement Mile for 100,000 Total Movement Miles, totaling $3,000 (three thousand U.S. Dollars) … Upon completion of 100,000 Total Movement Miles, CRST will waive the remaining balance of the $2,750.

75.     Considering that CRST was willing to forgive $2750 of the cost if Plaintiff and Plaintiff Drivers drove 100,000 miles with CRST, it is extremely unlikely that the program cost CRST more than $3000.

76.     That makes $2750, when it was charged by CRST, a usurious penalty charge and pure profit to CRST.

77.     The threat of the usurious penalty charge is an abuse of legal process.

78.     Paragraph 4 of the Agreement states that:

[i]n the event You do not accept or are not offered employment with CRST, the total Cost of the Program (i.e. $5750) will be due and owing immediately upon demand of CRST. If your employment with CRST is voluntarily *or involuntarily* terminated, any remaining balance owed under the Note will be due and owing immediately upon demand of CRST. (emphasis added)

79.     Thus, CRST isolates potential drivers and pressures them to drive with the threat of involuntary termination and debt collection.

80.     Termination, or failure to pass the CDL, would result in not only the Plaintiff Drivers having to pay back the funds on demand, if the debt went to a collections agency, they would have to pay *25% more as penalty* or the "maximum percentage permitted by applicable law" Agreement Para. 15.

81.     The Agreement gets worse. Plaintiff Drivers were not allowed to work for anyone else. Paragraph 7 of the Agreement states:

In exchange for CRST advancing the costs of the Program and other valuable consideration, You agree that you will not, without the written authorization of CRST, for a period of ten (10) calendar months after completion of the Program (the "Non-Compete Term") use the licensure You obtained as a result of the training obtained under this Agreement to provide driving services to any person or entity competing with CRST.

8

82.     Paragraph 8 of the Agreement states:

> CRST shall be entitled to payment by You for all costs and expenses, including reasonable attorney fees, incurred by CRST in enforcing any provision of this Agreement. CRST shall also be entitled to pursue any other remedy available at law, including legal remedies available against any person or company who hires You in violation of this Non-Compete Agreement.

83.     Paragraph 9 of the Agreement allows CRST to hold the CDL certification of completion hostage and not provide them to drivers until they "have fully satisfied [their] repayment obligation to CRST, as set forth above.", thus preventing them from working for other trucking companies and in that way forcing their labor for CRST.

84.     Amazingly, Paragraph 17 of the Agreement provides that, if a driver does not inform CRST of a change of cell phone number, the driver must indemnify CRST for CRST's violations of the Telephone Consumer Protection Act, including CRST's attorneys' fees!

85.     All of these paragraphs in different ways constitute a threatened abuse of process.

86.     Paragraph 13 says that the signatory "expressly waives [their] ability to bring or maintain a class action or similar proceeding against CRST".

87.     The insertion of that paragraph by CRST is an unconscionable effort to insulate CRST from liability under state and federal law.

88.     The insertion of that paragraph by CRST is a sign that CRST knew that the agreement created claims (such as the causes of action in this Complaint) for thousands of new drivers.

89.     The insertion of that paragraph was done so that CRST could recklessly disregard its minimum pay FLSA obligations, which it in fact ignored.

90.     The insertion of that paragraph was done so that CRST could recklessly disregard its obligation to refrain from human trafficking under the TVPA. Instead, it has engaged in human trafficking.

91.     The Repayment Agreement insulted Mr. Cheatham and the Plaintiff Drivers with other indignities including:

> You acknowledge that you have had the opportunity for your own legal counsel to review this Agreement before signing.

92. Such abuse of legal process is also apparent in the Promissory Note With Demand Feature, also signed March 28. 2022 ("Note").

93. The Demand feature of the Note set out in paragraph 3 allows CRST to demand payment in full from Plaintiff Drivers at any time for reasons completely and solely in CRST's control.

94. After signing the Agreement and the Note, Mr. Cheatham and the other Plaintiff Drivers completed the CDL training.

*Circumstances of Signing*

95. Mr. Cheatham and the Plaintiff Drivers were surprised on Monday morning, the first day of training, with the Repayment Agreement and the Promissory Note. They were told sign by Wednesday or take a bus home.

96. Mr. Cheatham and his classmates were vulnerable, far from their support network, and didn't want to take a bus home and admit failure: the contours of CRST's program were designed to create and exploit this vulnerability.

97. Their isolation contributed to their decision to sign the agreement.

98. Mr. Cheatham and his classmates were already reliant on CRST for food and lodging, with no other employment, forbidden to work with other trucking companies and now knew they would be in debt over five thousand dollars, Mr. Cheatham and other drivers, however felt they had no choice but to sign and make it work.

99. Once Plaintiff Drivers had signed the Agreement, they were under the constant threat of abuse of legal process, CRST even forcing the Plaintiff Drivers to pay to defend CRST for its own illegal activity.

100. The training featured many moments of abuse and public humiliation from instructors, including that the accommodations were not livable.

*Driving For CRST and CRST Expedited Solutions Wage Verification*

101. Mr. Cheatham began working for CRST the week of June 19, 2002.

10

102.     On June 21, 2022, CRST provided Mr. Cheatham a "CRST Expedited Solutions Wage Verification" ("Verification").

103.     The Verification indicated that he would be making $0.36/mile.

104.     He did not make $0.36 a mile, other Plaintiff Drivers did not either.

105.     This constituted a breach of the CRST Expedited Solutions Wage Verification by CRST.

106.     Like all other newly-qualified drivers at CRST indebted to them, Plaintiff was required to team-drive.

107.     Mr. Cheatham began team driving under a schedule of a truck "always moving". For six days, he would be in the truck nearly twenty-four hours a day. He would drive for eleven hours, be awake for five hours ("transition time") and be in his bunk for eight hours ("bunk time").

108.     This was the pattern of driving for all the Plaintiff Drivers.

109.     CRST was obligated to compensate Mr. Cheatham and the Plaintiff Drivers for all of their time except for the eight hours bunk time – sixteen hours a day.

110.     The Wage Verification is a self-contradictory and confusing document but confirms that as a new driver, Mr. Cheatham will receive $0.36 per mile:

> I am a new driver who has signed a Financial Agreement in school. I will be in the CRST training program with a Driver Mentor. My wage rate will be .36 cents per mile. I will split miles with my Mentor and/or Co-driver.

111.     The Wage Verification is signed by all Plaintiff Drivers.

*Actual Wages*

112.     However, when Mr. Cheatham received his first pay, he found out – for the first time- that he would be paid not $0.36 or $0.33 per mile but $0.12.

113.     Mr. Cheatham therefore was paid around $5.00/hour or less.

114.     This experience existed for all Plaintiff Drivers.

115.     Mr. Cheatham drove for CRST for about four months but could not make enough money to provide for his family.

11

116.     CRST kept his last pay in its entirety as "repayment".

117.     CRST kept all ex-employee Plaintiff Drivers' last pay as "repayment" if they had got their training through CRST.

118.     CRST pursued Plaintiff and all Plaintiff drivers for repayment.

119.     CRST collected the total amount owed from Mr. Cheatham so he paid the total of $5750.00.

120.     CRST pursued all drivers who left their employment and still 'owed' them money.

121.     That pursuit was abuse of legal process.

*Iowa Monitoring*

122.     CRST has two-way cameras installed on all their trucks including the trucks driven by Mr. Cheatham and Plaintiff Class.

123.     CRST hires staff to monitor the drivers from the CRST offices in Cedar Rapids, Iowa.

124.     CRST therefore supervises the Plaintiff Drivers in Iowa.

<u>**CLASS ACTION ALLEGATIONS**</u>
<u>**Based On Iowa Law and TVPA**</u>

125.     Plaintiff incorporates and realleges all paragraphs above.

126.     Plaintiff brings a nationwide class action on behalf of himself and all CRST drivers who have been similarly deprived of rights under the TVPA and Iowa law by Defendants in the manner described in this Complaint. The Class that Plaintiffs seek to represent is composed of and defined as:

> All persons who are or have been an employee driver for CRST in the United States under a Commercial Driver's License Training and Repayment Agreement or similar written contract for training and employment ("Drivers") during the period commencing five (5) years prior to the filing of the Complaint through trial in this action.

127.     At all relevant times, Plaintiff and Class Members were each an "employee" within the meaning of Iowa law. See I.C.A. § 91A.2(3)(a).

128.     At all relevant times, Defendants were "employers" of Plaintiff and Class Members within the meaning of Iowa law. See I.C.A. § 91A.2(4).

12

129.    Plaintiff reserves the right to modify or redefine "Class Members" for purposes of this action and to add subclasses as appropriate based on further investigation, discovery, and theories of liability.

130.    Class treatment of National Class Members is appropriate under Rule 23 for the following reasons:

A. Numerosity: Class Members are so numerous that joinder would be impractical, and the disposition of their claims on a class (rather than individual) basis will conserve resources of the parties and judicial system. While the number of Class Members is unknown at this time, this information can be readily ascertained from Defendant's business records. Upon information and belief, Defendant employs, or has employed, over one thousand Class Members during the Class Period.

B. Commonality: Common questions of law and fact exist and predominate as to Plaintiff and Class Members, including, but not limited to:

i. Whether Defendants' treatment of Plaintiff and Class Members constituted "involuntary servitude" under 22 U.S. Code § 7102.8(a).

ii. Whether the Agreement, Note and other documentation constituted "threatened abuse of the legal process" under 22 U.S. Code § 7102.1.

iii. Whether Defendants' collection efforts constituted "abuse of the legal process" under 22 U.S. Code § 7102.1.

iv.  Whether Defendants fraudulently misrepresented the terms and conditions of Plaintiff Drivers' employment prior to Plaintiff Drivers commencing training.

v. Whether Defendants were unjustly enriched by charging Plaintiff Drivers $5750 (or near that) for their CDL training.

vi. Whether Defendants were unjustly enriched by withholding Plaintiff Drivers' wages without lawful purpose in violation of I.C.A §91A.5.

vii. Whether Defendants were unjustly enriched by charging Plaintiff Drivers in excess of $20 for their relocation in violation of I.C.A §91A.5(g).

13

viii. Whether Defendants failed to pay Plaintiff Drivers minimum wage in violation of I.C.A. §91D *et seq.*

C. Typicality: Plaintiff's claims are typical of the claims of Class Members because Plaintiff and Class Members were subject to the same employment policies and practices of Defendant during the Class Period, and each sustained damages. Proof of a common or single state of facts will therefore establish the right of Plaintiff and Class Members to recover.

D. Adequacy: Plaintiff will fairly and adequately represent the interests of Class Members because Plaintiff is a Class Member and has the same legal and factual issues as Class Members and has no interests antagonistic to Class Members. Plaintiff has retained both local and national legal counsel competent and experienced in class actions, including labor and employment litigation. Plaintiff and his counsel are aware of their fiduciary responsibilities to Class Members and are determined to discharge those duties diligently by vigorously seeking the maximum possible recovery for Class Members.

E. Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Plaintiff and each Class Member has been damaged and is entitled to recovery by reason of Defendant's violations of the Trafficking Victims Protection Act; illegal failure to pay Class Members minimum wage in violation of Iowa wage-and-hour law; Defendants' fraudulent misrepresentations inducing Class Members to enter into forced labor and Defendants' unjust enrichment by overcharging for training and making illegal deductions to Class Members' pay. Class action treatment will permit a relatively large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense. Furthermore, the prosecution of individual lawsuits by each Class Member would present the risk of inconsistent and contradictory judgments, along with the potential for establishing inconsistent standards of conduct for Defendant and other state employers. Consequently, an important public interest will be served by addressing this matter as a class action.

14

## FLSA COLLECTIVE ALLEGATIONS

131. Plaintiff incorporates and realleges all paragraphs above.

132. Plaintiff brings this action on behalf of himself and all similarly situated CRST drivers as a collective action pursuant to 29 U.S.C. § 216(b) (hereinafter "FLSA Collective Members" or "FLSA Collective").

133. FLSA Collective Members are similarly situated to Plaintiff, and vice versa.

134. Plaintiff is similarly situated to FLSA Collective Members based on the same factors of commonality, typicality, and adequacy enumerated above.

135. At all relevant times, Plaintiff and FLSA Collective Members were each an "employee" within the meaning of the FLSA. See 29 U.S.C. § 203(e), (g).

136. At all relevant times, Defendants were "employers" of Plaintiff and FLSA Collective Members within the meaning of the FLSA. See 29 U.S.C. § 203(d), (g).

137. Plaintiff reserves the right to modify or redefine "FLSA Collective Members" for purposes of this action and to add subclasses as appropriate based on further investigation, discovery, and theories of liability.

138. Pursuant to 29 U.S.C. § 216(b), Plaintiff has filed his consent to join this FLSA collective action as of September 27, 2024.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Fraudulent Misrepresentation

### (On Behalf of Plaintiff and the Class)

139. Plaintiff incorporates and realleges all paragraphs above.

140. CRST represented to Plaintiff and Plaintiff Drivers that they would make $0.36/mile if they trained at a CRST school and drove with CRST.

141. CRST knew that Plaintiff and Plaintiff Drivers would not earn $0.36/mile when that representation was made.

142. CRST intended to deceive Plaintiff and Plaintiff Drivers that they would earn  $0.36/mile.

15

143. Plaintiff and Plaintiff Drivers did not make $0.36/mile.

144. The representation that Plaintiff and Plaintiff Drivers would make $0.36 was a material to their decision to work for CRST.

145. Plaintiff and Plaintiff Drivers acted in reliance on CRST representations about pay.

146. CRST intended to deceive the Plaintiff and Plaintiff Drivers until the Plaintiff and Plaintiff Drivers had no real way to back out of the forced labor.

147. CRST's misrepresentations were the proximate cause of Plaintiff and Plaintiff Driver's damages.

148. Plaintiff and Plaintiff Drivers were damaged in an ascertainable amount.

**WHEREFORE** Plaintiff and Class Members demand payment by Defendants of their benefit-of-the-bargain damages and all other consequential damages, together with attorney's fees, costs, and interest as provided by law.

## SECOND CAUSE OF ACTION

### Breach of Contract

### (On Behalf of Plaintiffs and the Class)

149. The Wage Verification is one of the documents that made up the various papers reflecting Plaintiff and Plaintiff Drivers' employment with CRST.

150. The Wage Verification obligated CRST to pay 0.36 per mile.

151. CRST did not pay new drivers 0.36 per mile.

152. The Wage Deduction Authorization required CRST to comply with state and Federal minimum wage obligations to the benefit of the Plaintiff and Plaintiff Drivers.

153. CRST did not comply with state and Federal minimum wage obligations to the benefit of Plaintiff and Plaintiff Drivers.

154. CRST therefore breached its employment agreement with Plaintiff and Plaintiff Drivers.

**WHEREFORE** Plaintiff and Class Members demand payment by Defendants of their benefit-of-the-bargain damages and all other consequential damages, together with attorney's fees, costs, and interest as provided by law.

16

**Deduction from wages in violation of I.C.A. § 91A.5(1)**

**(On Behalf of Plaintiffs and the Class)**

155.    I.C.A §91A.5 provides that employers may not withhold employee's wages unless there is a lawful purpose accruing to the benefit of the employee.

156.    The lawful purpose of training the employee to pass the CDL should be valued at the amount CRST paid to the driver school, which is not known now, but upon information and belief is $1,500.

157.    The remaining amount paid back by Plaintiff and Plaintiff Drivers, which constitutes profit to CRST should be refunded.

**WHEREFORE**, Plaintiffs and Class Members demand payment by Defendants for all deductions made to their pay and damages due under I.C.A. § 91A.8 including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages" and interest as provided by law.

**FOURTH CAUSE OF ACTION**

**Deduction from wages in violation of I.C.A. § 91A.5(2)(g)**

**(On Behalf of Plaintiffs and the Class)**

158.    CRST charged Plaintiff and Plaintiff Drivers for "transportation to the training school, lodging during training, up to two meals/day during training,"

159.    These charges were relocation expenses of people under a contingent employment agreement and who were employees at the time the charges were made.

160.    I.C.A. § 91A.5(2)(g) provides that employers may not charge employees for relocation in amounts greater than $20.

**WHEREFORE**, Plaintiffs and Class Members demand payment by Defendants for all deductions made to their pay and damages due under I.C.A. § 91A.8 including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees

17

incurred in recovering the unpaid wages" and interest as provided by law.

## FIFTH CAUSE OF ACTION

### Forced Labor in Violation of the Trafficking Victims Protection Act 18 U.S.C. § 1589

### (On Behalf of Plaintiffs and the Class)

161.    Plaintiffs incorporate and reallege all paragraphs above.

162.    The "fundamental purpose" of the Trafficking Victims Protection Act is to "reach cases of servitude achieved through … threatened abuse of legal process."

163.    Under 18 U.S.C. § 1589(a)(3), a plaintiff must show that the defendant "knowingly provide[d] or obtain[ed]" plaintiffs' labor or services by means of … (3) "abuse or threatened abuse of law or legal process";

164.    18 U.S.C.A. § 1595 provides that "an individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees."

165.    CRST obtained the services of Mr. Cheatham and Plaintiff Drivers by transporting them to a location away from their homes with fraudulent misrepresentations and then forcing them to sign a Repayment Agreement that was replete with threats of legal process against Plaintiff Drivers for failing to drive with CRST, failure to pay the excessive debt and failure to adhere to the illegal non-competition clause in the Agreement.

**WHEREFORE**, Plaintiff and Class Members demand damages and reasonable attorneys' fees together with costs and interest as provided by law.

18

## SIXTH CAUSE OF ACTION

### Unjust Enrichment

### (On Behalf of Plaintiffs and the Class)

166. Plaintiff incorporates and re-alleges all paragraphs above.

167. CRST was enriched by the repayment by Plaintiff and Plaintiff Drivers of a debt that in large part should not have existed.

168. In particular, the penalty charge of $2750 constitutes unjust enrichment of CRST.

169. In particular, the difference between the actual cost to CRST of driver training and the $3000 base charge for the training constitutes unjust enrichment of CRST.

170. Plaintiff and Plaintiff Drivers earned funds that were kept by CRST or collected by CRST at the expense of the Plaintiff and Plaintiff Drivers.

171. It is unjust to allow CRST to retain the benefit of repayment in this circumstance.

## SEVENTH CAUSE OF ACTION

### Failure to Pay Minimum Wages in Violation of I.C.A. § 91D.1 *et seq*

### (On Behalf of Plaintiff and the Class)

172. Plaintiff incorporates and realleges all paragraphs above.

173. I.C.A. § 91D.1 requires that each employer pay to its employee the state hourly wage, which, since 2008, has been $7.25 for each compensable hour they spend at the employer's behest.

174. CRST had Plaintiff and Plaintiff Drivers working in teams and spending nearly 24 hours a day in a truck for six days per pay period.

175. CRST had an obligation to compensate Plaintiff and Plaintiff drivers for eleven hours of drive time, three hours of transition time and two hours of non-berth time, for a total of sixteen hours per twenty-four-hour period they were on the road.

176. CRST intentionally compensated Plaintiff and Plaintiff drivers at a rate that fell below minimum wage for each hour of compensable time.

177. CRST intentionally paid Plaintiff Drivers well below the state hourly wage.

**WHEREFORE**, Plaintiff and Class Members demand payment by Defendants at the regular hourly pay rate for Drivers or the minimum wage rate, and damages due under I.C.A. § 91A.D1 including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages" and interest as provided by law.

### EIGHTH CAUSE OF ACTION

### Failure to Pay Minimum Wages in Violation of the FLSA, 29 U.S.C § 206

### (On Behalf of Plaintiff and the FLSA Collective)

178.    Plaintiff incorporates and realleges all paragraphs above.

179.    Under the FLSA, "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [federal minimum wage rate] …." 29 U.S.C. § 206(a)(l).

180.    As a result of Defendants policies and practices, Plaintiff and FLSA Collective Members were not paid minimum wages in that:

    a.  They were not paid for all training time;

    b.  They were paid by the mile without regard to the number of hours worked (and were not paid at all for some work) and thereby were not paid at least minimum wage for all hours worked;

    c.  They each had deductions taken from their paychecks and/or owed monies back to Defendants for the training that they were required to undergo at the beginning of their employment; and

    d.  They were not paid their wages free and clear.

181.    Defendants' violation of the FLSA has been willful, and Defendants knew or should have known that their policies and practices were unlawful.

**WHEREFORE**, Plaintiff and Collective Members demand payment by Defendants at the federal

minimum wage rate for all hours worked during the FLSA Period, plus an additional equal amount as liquidated damages, together with attorney's fees, costs, and interest as provided by law.

## NINTH CAUSE OF ACTION

### Unlawful and Unconscionable Contractual Provisions

### (On Behalf of Plaintiff, the Class, and the FLSA Collective)

182.    Defendants' CRST Commercial Driver's License Training and Repayment Agreement and Promissory Note and Defendants' Wage Deduction Authorization (collectively "Agreements") are unconscionable and violate the statutory and/or common law of Iowa and/or several states, as well as the FLSA.

183.    Accordingly, these Agreements and/or their contractual provisions should be declared null and void, and Defendants should be enjoined from enforcing these Agreements and/or their unlawful or unconscionable provisions.

## ADDITIONAL PRAYER FOR RELIEF

WHEREFORE Plaintiff, individually and on behalf of Class and Collective Members and all others similarly situated, prays for relief as follows:

1.    For an order certifying this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class of Drivers;

2.    For an order conditionally certifying this action as a collective action under the FLSA on behalf of the Collective Class;

3.    For an order appointing Plaintiff as representative and his counsel as class counsel for the Class and FLSA Collective;

4.    For damages, according to proof for the regular rate of pay under applicable state or federal law for all hours worked;

5.    For liquidated damages and attorneys' fees according to proof for the minimum wage rate under I.C.A. § 91A.8;

21

6. For wages or expenses that were intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages;

7. For liquidated damages, pursuant to 29 U.S.C. § 216(b);

8. For a declaration that the Agreements are null, void, and unenforceable;

9. For a declaration that the non-competition provision in the Agreements is unenforceable;

10. For a declaration that the purported class action waiver in the Agreements is unconscionable and/or unenforceable.

11. For a declaration that the purported class action waiver in the Agreements constitutes an invalid waiver of rights under the FLSA and is thereby invalid and unenforceable.

12. For an injunction preventing Defendants from pursuing collection of unlawfully charged amounts and/or deducting such amounts from employees' wages and requiring Defendants to take action to cease all third-party collections of these amounts and to take whatever actions are necessary to repair any damage done to employees' credit;

13. For an injunction preventing Defendants from enforcing any unlawful or unconscionable provision in the Agreements;

14. For interest as provided by law at the maximum legal rate;

15. For reasonable attorneys' fees authorized by Federal law, Iowa law, common law, or equity;

16. For costs of suit incurred herein;

17. For pre-judgment and post-judgment interest at the maximum legal rate;

18. For such other relief as the Court may deem just and proper.

Respectfully Submitted,

DATED: April 30, 2025

*/s/Rachel Mariner*
Rachel Mariner
RAFII & ASSOCIATES, P.C.
1120 N. Town Center Dr., Suite 130
Las Vegas, NV 89144

22

Tel: (725) 245-6056
rachel@rafiilaw.com
*Attorneys for Plaintiff*

Nathan Willems
Emily Shotthood
RUSH & NICHOLSON, P.L.C.
Tel: (319) 363-5209
nate@rushnicholson.com
emily@rushnicholson.com

**CERTIFICATE OF SERVICE**

The undersigned certifies, pursuant to LR 5(a), that a true and correct copy of this document was served electronically upon all parties to the above cause of action through the Court's ECF system to each of the attorneys of record herein at their respective addressees disclosed on the pleadings on April 30, 2025.

James H. Hanson
Angela S. Cash
Andrew J. Ireland
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
jhanson@scopelitis.com
acash@scopelitis.com
aireland@scopelitis.com
*Attorneys for Defendant*

Kevin J. Visser
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
kvisser@spmblaw.com
*Attorneys for Defendant*

*/s/ Marcus Johnson*
An employee of RAFII & ASSOCIATES, P.C.

# EXHIBIT B

# EXHIBIT B

UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| CHRISTOPHER CHEATHAM, on behalf of himself and all others similarly situated, | |
| V. | Case No. 1:24-CV-109 |
| CRST INTERNATIONAL HOLDINGS, LLC; CRST EXPEDITED, INC, d/b/a CRST THE TRANSPORTATION SOLUTION, INC. | SECOND AMENDED COMPLAINT |
| Defendants. | |

Deleted: FIRST

Plaintiff CHRISTOPHER CHEATHAM, individually and on behalf of all other persons similarly situated, by his undersigned attorneys as and for the Class Action and Collective Action alleges as follows:

## INTRODUCTION

1.     This is a class and collective action for fraudulent misrepresentation, breach of contract, unjust enrichment, forced labor, unpaid wages, liquidated damages, statutory fines, declaratory and injunctive relief, attorneys' fees and costs, and interest under the Iowa Code Annotated ("I.C.A."), Iowa common law, the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1589 *et seq.,* and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*

2.     Plaintiff Christopher Cheatham ("Mr. Cheatham" or "Plaintiff") is one of many people ("Plaintiffs" or "Plaintiff Drivers") recruited under false pretenses to receive  training for a Commercial Driver's License ("CDL") and then forced by debt and threatened abuse of legal process to drive for CRST International Holdings LLC., through its wholly-owned and controlled subsidiary CRST Expedited ("CRST") even though their compensation per hour was less than minimum wage, and even though CRST deducted a handsome profit margin for itself from their wages.

Deleted: First Amended Complaint

Deleted: /inducement

1

3.      Specifically, Plaintiff Drivers allege that (a) CRST made fraudulent representations, using false and misleading phone calls and advertising to induce drivers to enter into CRST's Commercial Driver's License Training and Repayment Agreement or similar arrangement; (b) CRST breached the its promise to pay 0.36/mile as set out in the CRST Expedited Solutions Wage Verification and its promise to pay minimum wage in the CRST Wage Deduction Authorization; (c) CRST was unjustly enriched by the repayment agreement they forced Plaintiff Drivers to sign; (c) CRST deducted amounts from Plaintiff Driver wages in violation of I.C.A. § 91A.5(1) and I.C.A. § 91A.5(2)(g); (d) Plaintiff Drivers were forced by debt and threat of legal process to drive for CRST in violation of the TVPA and the Iowa Human Trafficking Law; (e) CRST did not pay Plaintiff Drivers minimum wage for the hours they were due compensation in violation of Iowa law; (e) CRST did not pay Plaintiff Drivers minimum wage for the hours they were due compensation in violation of the FLSA.

4.      All allegations in this Complaint are based on information and belief except for those allegations pertaining specifically to Plaintiff, which are based on his personal knowledge. Each allegation in this Complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

## PARTIES

5.      At all relevant times, Plaintiff CHRISTOPHER CHEATHAM ("Plaintiff" or "Mr. Cheatham") was and is a natural person residing in Las Vegas, Nevada.

6.      Mr. Cheatham was an employee of CRST along with his similarly-situated co-workers subject to the class and collective action allegations of this Complaint, "Plaintiffs" or "Plaintiff Drivers."

7.      At all relevant times, Plaintiff Drivers were 'employees' for purposes of Plaintiffs' claims under Iowa Law and the FLSA in that Defendants suffered or permitted them to work.  I.C.A. § 91A.2(3)(a); 29 U.S.C. § 203(e), (g).

8.      Defendant CRST International Holdings LLC is the owner of the subsidiary CRST Expedited Inc also named as Defendants.

9.      Defendant CRST International Holdings LLC controlled the policies and procedures of its subsidiaries.

2

10.    Defendant CRST International Holdings LLC shares corporate headquarters with Defendant CRST Expedited at 3630 16th Avenue SW, Cedar Rapids, Iowa.

11.    Harald Smith started CRST as a trucking company in 1971.

12.    John Smith, Herald Smith's son is the Chairman of the Board of CRST International Holdings, LLC.

13.    John Smith describes CRST International Holdings LLC as "a national truckload and flatbed carrier" in his American Trucking Associations Biography.

14.    CRST is owned by John Smith; his wife, and their three children. The ownership structure involves one holding company CRST International Holdings LLC that owns the family's main trucking and logistics company, CRST Expedited.

15.    Defendants CRST Expedited, Inc. does business as CRST The Transportation Solution, Inc.

16.    Collectively, both CRST entities herein, ("CRST" or "Defendants") are privately owned companies owned and operated by related individuals and entities for a common business purpose: transportation of freight for CRST customers.

17.    Defendant CRST Expedited, Inc. entered into the CRST Commercial Driver's License Training and Repayment Agreement with Plaintiff.

18.    Defendants have thousands of employee drivers and ex-drivers and people who signed the CRST Commercial Driver's License Training and Repayment Agreement or were subject to a substantially similar scheme.

19.    Defendants with their sister and subsidiary companies have annual revenue in excess of $1.7 billion.

**JURISDICTION AND VENUE**

20.    Plaintiff incorporates and realleges all paragraphs above.

21.    Because Plaintiff's FLSA claim and TVPA claim arise under federal law, the Court has federal question jurisdiction pursuant to 28 U.S.C §1331.

22.    In addition, the Court has supplemental jurisdiction over Plaintiff's Iowa state-law claims

3

under 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative fact regarding Defendant's unlawful treatment of Plaintiff, and form part of the same case and controversy.

23.     Venue is proper in this Court because Defendants are headquartered and operate within this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. See 28 U.S.C. § 1391(b).

**FACTUAL ALLEGATIONS**

24.     CRST is in constant need of long-haul team drivers, an unpopular and grueling position.

25.     CRST fills this need with a plan to force labor set out herein.

26.     CRST induces vulnerable individuals - people who have never been truckers before and therefore don't know better - by means of high-pressure phone calls, print, radio, television and internet advertising to drive for them.

27.     CRST's key point in recruiting individuals is that they will change their life and earn a good wage.

28.     CRST knew or had reason to know that it would in fact overcharge drivers for their training and pay them less than minimum wage.

*Mr. Cheatham's Experience*

29.     Mr. Cheatham was managing a men's clothing store in Las Vegas, Nevada at the beginning of 2022.

30.     In the evenings he began searching for more long-term career prospects online.

31.     Mr. Cheatham came across CRST with its offer for "sponsored training" and input his phone number.

32.     A "Bruce" from CRST began calling Mr. Cheatham repeatedly, trying to convince him to join CRST and take advantage of the training.

33.     The person told him that this was the career he needed – that he could immediately start making money after training and that he would stay in good accommodations for training.

4

34.     Mr. Cheatham didn't have his CDL so he signed up for CRST "sponsored" training.

35.     In reliance on Bruce's representations, Mr. Cheatham quit his retail job to pursue working for CRST.

36.     CRST sent him to attend Careers Worldwide, 45 S. Main St., Keensburg, CO 80643 for training for his CDL.

37.     At all times Careers Worldwide functioned as the agent of CRST.

38.     Mr. Cheatham had no right choose which driving school he would attend.

39.     Mr. Cheatham travelled to Keensburg, CO.

40.     There he found out the living conditions at Careers Worldwide.

41.     For his training accommodation his entire class of adult men shared one three-bedroom condo – one bedroom held six bunks, and two held four bunks each.

42.     The overly crowded living conditions made sleeping, grooming and adequate ventilation very difficult.

43.     The trainees were not allowed to drag their mattress into the living room to get more air and space.

44.     For food, all trainee drivers were given $70 per week to purchase their own.

45.     There was a store with extortionately priced food at Careers Worldwide where $70 would not last for a week of meals.

46.     People at Careers Worldwide would charge $20 to drive trainees to Walmart to get food.

47.     None of the people in his class of trainees had assets or spare cash. One was homeless and planned to live in the truck after he started driving.

48.     Most of the people in Mr. Cheatham's class of trainees were broke.

49.     Some of the people ran out of money and went hungry during training.

50.     Mr. Cheatham's classmates were from all over. Three were from Texas, one from California, one from Kentucky.

51.     No classmates had chosen the driving school. They had been directed there by CRST.

5

52.     When Mr. Cheatham and his classmates arrived before training began on Monday, they were given a booklet to prepare for the learner's permit exam for CDL in Colorado.

53.     Mr. Cheatham and his classmates expected to start on the learner's permit exam in Colorado when classes started.

54.     Instead, the employees of Careers Worldwide, acting as agents of CRST, gave Mr. Cheatham and his classmates some documents.

55.     The employees of Careers Worldwide said sign these or go home.

i.      *Wage Deduction Authorization*

56.     The first was "Wage Deduction Authorization".

57.     Mr. Cheatham signed his Wage Deduction Authorization on March 28, 2022.

58.     Mr. Cheatham, now jobless and in a strange city, reliant on CRST for food and shelter, had no choice but to sign the Wage Deduction Authorization and the other documents put before him that day.

59.     Mr. Cheatham's fellow Plaintiff Drivers were similarly situated and without choice.

60.     The Wage Deduction Authorization indicates:

> I hereby authorize CRST Inc. d/b/a CRST The Transportation Solution, Inc ("CRST") to withhold from my weekly wages the total amount equaling $0.03 per Total Movement Mile which shall be withheld for the purpose of repaying my financial obligations under my CRST Commercial Driver's License Training and Repayment Agreement (the "Agreement"). … I represent that this authorization is executed voluntarily and has not been made as a condition of my continued employment.

61.     It was not really voluntary. Mr. Cheatham and his classmates felt they had no choice but to go forward.

62.     Mr. Cheatham and his classmates did not know what Total Movement Mile meant.

63.     The Wage Deduction Authorization states "CRST may withhold the remaining amount owed from my final pay, except to the extent prohibited by federal or state minimum wage law."

64.     To the extent the Wage Deduction Authorization is enforceable, CRST breached this element of the Authorization.

ii.     *CRST Commercial Driver's License Training and Repayment Agreement and Promissory Note*

6

**Deleted:** contract

65.    CRST, through the training school, also forced Mr. Cheatham and his classmates to sign CRST Commercial Driver's License Training and Repayment Agreement ("Agreement") in order to commence training.

66.    The Agreement asserts that the cost of the training Program is five thousand, seven hundred fifty dollars ($5750.00).

67.    The amount that CRST actually paid Careers Worldwide (the driving school in Keenesburg, CO) for Mr. Cheatham's and Plaintiff Driver training is unknown.

68.    The amount that CRST or Careers Worldwide were compensated by third parties for Mr. Cheatham's and Plaintiff Driver training is unknown.

69.    Upon information and belief, the true cost of the "CDL training school tuition" is not $5750 but as little as $1500.

70.    Further CRST illegally charged Plaintiff and Plaintiff Drivers via the Agreement. Included in the $5750 that will be charged to drivers (at Para 2 of the Agreement) are:

> [t]ransportation to the training school; lodging during training, up to two meals/day during training, federally required DOT physical and DOT Drug test, hair drug test, CLP Assistance and other fees, costs and expenses incurred by CRST

71.    I.C.A §91A.5 provides that employers may not withhold employee's wages unless there is a lawful purpose accruing to the benefit of the employee.

72.    I.C.A §91A.5(g) provides that it is unlawful for employers to charge employees for costs of more than twenty dollars for an employee's relocation to the place of employment.

73.    Because these documents constituted a contingent employment agreement, I.C.A. §91A.5(g) prohibits CRST for the charges it made to Plaintiff and Plaintiff Drivers.

74.    Besides forcing Mr. Cheatham and the Plaintiff Drivers to pay costs unlawfully charged the Agreement seals Mr. Cheatham's fate. It informs Mr. Cheatham without choice that:

7

CRST will deduct from his paycheck $0.03 per Total Movement Mile for 100,000 Total Movement Miles, totaling $3,000 (three thousand U.S. Dollars) … Upon completion of 100,000 Total Movement Miles, CRST will waive the remaining balance of the $2,750.

75.     Considering that CRST was willing to forgive $2750 of the cost if Plaintiff and Plaintiff Drivers drove 100,000 miles with CRST, it is extremely unlikely that the program cost CRST more than $3000.

76.     That makes $2750, when it was charged by CRST, a usurious penalty charge and pure profit to CRST.

77.     The threat of the usurious penalty charge is an abuse of legal process.

78.     Paragraph 4 of the Agreement states that:

[i]n the event You do not accept or are not offered employment with CRST, the total Cost of the Program (i.e. $5750) will be due and owing immediately upon demand of CRST. If your employment with CRST is voluntarily *or involuntarily* terminated, any remaining balance owed under the Note will be due and owing immediately upon demand of CRST. (emphasis added)

79.     Thus, CRST isolates potential drivers and pressures them to drive with the threat of involuntary termination and debt collection.

80.     Termination, or failure to pass the CDL, would result in not only the Plaintiff Drivers having to pay back the funds on demand, if the debt went to a collections agency, they would have to pay *25% more as penalty* or the "maximum percentage permitted by applicable law" Agreement Para. 15.

81.     The Agreement gets worse. Plaintiff Drivers were not allowed to work for anyone else. Paragraph 7 of the Agreement states:

In exchange for CRST advancing the costs of the Program and other valuable consideration, You agree that you will not, without the written authorization of CRST, for a period of ten (10) calendar months after completion of the Program (the "Non-Compete Term") use the licensure You obtained as a result of the training obtained under this Agreement to provide driving services to any person or entity competing with CRST.

8

82.     Paragraph 8 of the Agreement states:

>        CRST shall be entitled to payment by You for all costs and expenses, including
>        reasonable attorney fees, incurred by CRST in enforcing any provision of this
>        Agreement. CRST shall also be entitled to pursue any other remedy available at
>        law, including legal remedies available against any person or company who hires
>        You in violation of this Non-Compete Agreement.

83.     Paragraph 9 of the Agreement allows CRST to hold the CDL certification of completion hostage and not provide them to drivers until they "have fully satisfied [their] repayment obligation to CRST, as set forth above.", thus preventing them from working for other trucking companies and in that way forcing their labor for CRST.

84.     Amazingly, Paragraph 17 of the Agreement provides that, if a driver does not inform CRST of a change of cell phone number, the driver must indemnify CRST for CRST's violations of the Telephone Consumer Protection Act, including CRST's attorneys' fees!

85.     All of these paragraphs in different ways constitute a threatened abuse of process.

86.     Paragraph 13 says that the signatory "expressly waives [their] ability to bring or maintain a class action or similar proceeding against CRST".

87.     The insertion of that paragraph by CRST is an unconscionable effort to insulate CRST from liability under state and federal law.

88.     The insertion of that paragraph by CRST is a sign that CRST knew that the agreement created claims (such as the causes of action in this Complaint) for thousands of new drivers.

89.     The insertion of that paragraph was done so that CRST could recklessly disregard its minimum pay FLSA obligations, which it in fact ignored.

90.     The insertion of that paragraph was done so that CRST could recklessly disregard its obligation to refrain from human trafficking under the TVPA. Instead, it has engaged in human trafficking.

91.     The Repayment Agreement insulted Mr. Cheatham and the Plaintiff Drivers with other indignities including:

9

> You acknowledge that you have had the opportunity for your own legal counsel to review this Agreement before signing.

92. Such abuse of legal process is also apparent in the Promissory Note With Demand Feature, also signed March 28. 2022 ("Note").

93. The Demand feature of the Note set out in paragraph 3 allows CRST to demand payment in full from Plaintiff Drivers at any time for reasons completely and solely in CRST's control.

94. After signing the Agreement and the Note, Mr. Cheatham and the other Plaintiff Drivers completed the CDL training.

*Circumstances of Signing*

95. Mr. Cheatham and the Plaintiff Drivers were surprised on Monday morning, the first day of training, with the Repayment Agreement and the Promissory Note. They were told sign by Wednesday or take a bus home.

96. Mr. Cheatham and his classmates were vulnerable, far from their support network, and didn't want to take a bus home and admit failure: the contours of CRST's program were designed to create and exploit this vulnerability.

97. Their isolation contributed to their decision to sign the agreement.

98. Mr. Cheatham and his classmates were already reliant on CRST for food and lodging, with no other employment, forbidden to work with other trucking companies and now knew they would be in debt over five thousand dollars, Mr. Cheatham and other drivers, however felt they had no choice but to sign and make it work.

99. Once Plaintiff Drivers had signed the Agreement, they were under the constant threat of abuse of legal process, CRST even forcing the Plaintiff Drivers to pay to defend CRST for its own illegal activity.

100. The training featured many moments of abuse and public humiliation from instructors, including that the accommodations were not livable.

*Driving For CRST and CRST Expedited Solutions Wage Verification*

101. Mr. Cheatham began working for CRST the week of June 19, 2002.

10

---

**Deleted:** .

**Deleted:** The entire experience of driving school fell short of the humane treatment that prisoners of war are entitled to under the Geneva Convention in

**Deleted:** and they were subject to public humiliation

102.   On June 21, 2022, CRST provided Mr. Cheatham a "CRST Expedited Solutions Wage Verification" ("Verification").

103.   The Verification indicated that he would be making $0.36/mile.

104.   He did not make $0.36 a mile, other Plaintiff Drivers did not either.

105.   This constituted a breach of the CRST Expedited Solutions Wage Verification by CRST.

106.   Like all other newly-qualified drivers at CRST indebted to them, Plaintiff was required to team-drive.

107.   Mr. Cheatham began team driving under a schedule of a truck "always moving". For six days, he would be in the truck nearly twenty-four hours a day. He would drive for eleven hours, be awake for five hours ("transition time") and be in his bunk for eight hours ("bunk time").

108.   This was the pattern of driving for all the Plaintiff Drivers.

109.   CRST was obligated to compensate Mr. Cheatham and the Plaintiff Drivers for all of their time except for the eight hours bunk time – sixteen hours a day.

110.   The Wage Verification is a self-contradictory and confusing document but confirms that as a new driver, Mr. Cheatham will receive $0.36 per mile:

> I am a new driver who has signed a Financial Agreement in school. I will be in the CRST training program with a Driver Mentor. My wage rate will be .36 cents per mile. I will split miles with my Mentor and/or Co-driver.

111.   The Wage Verification is signed by all Plaintiff Drivers.

*Actual Wages*

112.   However, when Mr. Cheatham received his first pay, he found out – for the first time- that he would be paid not $0.36 or $0.33 per mile but $0.12.

113.   Mr. Cheatham therefore was paid around $5.00/hour or less.

114.   This experience existed for all Plaintiff Drivers.

115.   Mr. Cheatham drove for CRST for about four months but could not make enough money to provide for his family.

11

116.    CRST kept his last pay in its entirety as "repayment".

117.    CRST kept all ex-employee Plaintiff Drivers' last pay as "repayment" if they had got their training through CRST.

118.    CRST pursued Plaintiff and all Plaintiff drivers for repayment.

119.    CRST collected the total amount owed from Mr. Cheatham so he paid the total of $5750.00.

120.    CRST pursued all drivers who left their employment and still 'owed' them money.

121.    That pursuit was abuse of legal process.

*Iowa Monitoring*

122.    CRST has two-way cameras installed on all their trucks including the trucks driven by Mr. Cheatham and Plaintiff Class.

123.    CRST hires staff to monitor the drivers from the CRST offices in Cedar Rapids, Iowa.

124.    CRST therefore supervises the Plaintiff Drivers in Iowa.

**CLASS ACTION ALLEGATIONS**
**Based On Iowa Law and TVPA**

125.    Plaintiff incorporates and realleges all paragraphs above.

126.    Plaintiff brings a nationwide class action on behalf of himself and all CRST drivers who have been similarly deprived of rights under the TVPA and Iowa law by Defendants in the manner described in this Complaint. The Class that Plaintiffs seek to represent is composed of and defined as:

> All persons who are or have been an employee driver for CRST in the United States under a Commercial Driver's License Training and Repayment Agreement or similar written contract for training and employment ("Drivers") during the period commencing five (5) years prior to the filing of the Complaint through trial in this action.

127.    At all relevant times, Plaintiff and Class Members were each an "employee" within the meaning of Iowa law. See I.C.A. § 91A.2(3)(a).

128.    At all relevant times, Defendants were "employers" of Plaintiff and Class Members within the meaning of Iowa law. See I.C.A. § 91A.2(4).

12

Deleted: Drivers

Deleted: themselves

Deleted: other similarly situated members of the Class

129.  Plaintiff reserves the right to modify or redefine "Class Members" for purposes of this action and to add subclasses as appropriate based on further investigation, discovery, and theories of liability.

130.  Class treatment of National Class Members is appropriate under Rule 23 for the following reasons:

A. Numerosity: Class Members are so numerous that joinder would be impractical, and the disposition of their claims on a class (rather than individual) basis will conserve resources of the parties and judicial system. While the number of Class Members is unknown at this time, this information can be readily ascertained from Defendant's business records. Upon information and belief, Defendant employs, or has employed, over one thousand Class Members during the Class Period.

B. Commonality: Common questions of law and fact exist and predominate as to Plaintiff and Class Members, including, but not limited to:

i.  Whether Defendants' treatment of Plaintiff and Class Members constituted "involuntary servitude" under 22 U.S. Code § 7102.8(a).

ii.  Whether the Agreement, Note and other documentation constituted "threatened abuse of the legal process" under 22 U.S. Code § 7102.1.

iii.  Whether Defendants' collection efforts constituted "abuse of the legal process" under 22 U.S. Code § 7102.1.

iv.  Whether Defendants fraudulently misrepresented the terms and conditions of Plaintiff Drivers' employment prior to Plaintiff Drivers commencing training.

v. Whether Defendants were unjustly enriched by charging Plaintiff Drivers $5750 (or near that) for their CDL training.

vi.  Whether Defendants were unjustly enriched by withholding Plaintiff Drivers' wages without lawful purpose in violation of I.C.A §91A.5.

vii. Whether Defendants were unjustly enriched by charging Plaintiff Drivers in excess of $20 for their relocation in violation of I.C.A §91A.5(g).

13

viii. Whether Defendants failed to pay Plaintiff Drivers minimum wage in violation of I.C.A. §91D *et seq.*

C.  Typicality: Plaintiff's claims are typical of the claims of Class Members because Plaintiff and Class Members were subject to the same employment policies and practices of Defendant during the Class Period, and each sustained damages. Proof of a common or single state of facts will therefore establish the right of Plaintiff and Class Members to recover.

D.  Adequacy: Plaintiff will fairly and adequately represent the interests of Class Members because Plaintiff is a Class Member and has the same legal and factual issues as Class Members and has no interests antagonistic to Class Members. Plaintiff has retained both local and national legal counsel competent and experienced in class actions, including labor and employment litigation. Plaintiff and his counsel are aware of their fiduciary responsibilities to Class Members and are determined to discharge those duties diligently by vigorously seeking the maximum possible recovery for Class Members.

E. Superiority: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Plaintiff and each Class Member has been damaged and is entitled to recovery by reason of Defendant's violations of the Trafficking Victims Protection Act; illegal failure to pay Class Members minimum wage in violation of Iowa wage-and-hour law; Defendants' fraudulent misrepresentations inducing Class Members to enter into forced labor and Defendants' unjust enrichment by overcharging for training and making illegal deductions to Class Members' pay. Class action treatment will permit a relatively large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense. Furthermore, the prosecution of individual lawsuits by each Class Member would present the risk of inconsistent and contradictory judgments, along with the potential for establishing inconsistent standards of conduct for Defendant and other state employers. Consequently, an important public interest will be served by addressing this matter as a class action.

14

**FLSA COLLECTIVE ALLEGATIONS**

131.    Plaintiff incorporates and realleges all paragraphs above.

132.    Plaintiff brings this action on behalf of himself and all similarly situated CRST drivers as a collective action pursuant to 29 U.S.C. § 216(b) (hereinafter "FLSA Collective Members" or "FLSA Collective").

133.    FLSA Collective Members are similarly situated to Plaintiff, and vice versa.

134.    Plaintiff is similarly situated to FLSA Collective Members based on the same factors of commonality, typicality, and adequacy enumerated above.

135.    At all relevant times, Plaintiff and FLSA Collective Members were each an "employee" within the meaning of the FLSA. See 29 U.S.C. § 203(e), (g).

136.    At all relevant times, Defendants were "employers" of Plaintiff and FLSA Collective Members within the meaning of the FLSA. See 29 U.S.C. § 203(d), (g).

137.    Plaintiff reserves the right to modify or redefine "FLSA Collective Members" for purposes of this action and to add subclasses as appropriate based on further investigation, discovery, and theories of liability.

138.    Pursuant to 29 U.S.C. § 216(b), Plaintiff has filed his consent to join this FLSA collective action as of September 27, 2024.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Fraudulent Misrepresentation**

**(On Behalf of Plaintiff and the Class)**

139.    Plaintiff incorporates and realleges all paragraphs above.

140.    CRST represented to Plaintiff and Plaintiff Drivers that they would make $0.36/mile if they trained at a CRST school and drove with CRST.

141.    CRST knew that Plaintiff and Plaintiff Drivers would not earn $0.36/mile when that representation was made.

142.    CRST intended to deceive Plaintiff and Plaintiff Drivers that they would earn  $0.36/mile.

15

---

**Deleted:** Federal Class Members

**Deleted:** Class

**Deleted:** Class

**Deleted:** Class

**Deleted:** Class

**Deleted:** See attached Exhibit A.

143. Plaintiff and Plaintiff Drivers did not make $0.36/mile.

144. The representation that Plaintiff and Plaintiff Drivers would make $0.36 was a material to their decision to work for CRST.

145. Plaintiff and Plaintiff Drivers acted in reliance on CRST representations about pay.

146. CRST intended to deceive the Plaintiff and Plaintiff Drivers until the Plaintiff and Plaintiff Drivers had no real way to back out of the forced labor.

147. CRST's misrepresentations were the proximate cause of Plaintiff and Plaintiff Driver's damages.

148. Plaintiff and Plaintiff Drivers were damaged in an ascertainable amount.

**WHEREFORE** Plaintiff and Class Members demand payment by Defendants of their benefit-of-the-bargain damages and all other consequential damages, together with attorney's fees, costs, and interest as provided by law.

### SECOND CAUSE OF ACTION

### <u>Breach of Contract</u>

### (On Behalf of Plaintiffs and the Class)

149. The Wage Verification is one of the documents that made up the various papers reflecting Plaintiff and Plaintiff Drivers' employment with CRST.

150. The Wage Verification obligated CRST to pay 0.36 per mile.

151. CRST did not pay new drivers 0.36 per mile.

152. The Wage Deduction Authorization required CRST to comply with state and Federal minimum wage obligations to the benefit of the Plaintiff and Plaintiff Drivers.

153. CRST did not comply with state and Federal minimum wage obligations to the benefit of Plaintiff and Plaintiff Drivers.

154. CRST therefore breached its employment agreement with Plaintiff and Plaintiff Drivers.

**WHEREFORE** Plaintiff and Class Members demand payment by Defendants of their benefit-of-the-bargain damages and all other consequential damages, together with attorney's fees, costs, and interest as provided by law.

16

**THIRD CAUSE OF ACTION**

**Deduction from wages in violation of I.C.A. § 91A.5(1)**

**(On Behalf of Plaintiffs and the Class)**

155.    I.C.A §91A.5 provides that employers may not withhold employee's wages unless there is a lawful purpose accruing to the benefit of the employee.

156.    The lawful purpose of training the employee to pass the CDL should be valued at the amount CRST paid to the driver school, which is not known now, but upon information and belief is $1,500.

157.    The remaining amount paid back by Plaintiff and Plaintiff Drivers, which constitutes profit to CRST should be refunded.

**WHEREFORE**, Plaintiffs and Class Members demand payment by Defendants for all deductions made to their pay and damages due under I.C.A. § 91A.8 including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages" and interest as provided by law.

**FOURTH CAUSE OF ACTION**

**Deduction from wages in violation of I.C.A. § 91A.5(2)(g)**

**(On Behalf of Plaintiffs and the Class)**

158.    CRST charged Plaintiff and Plaintiff Drivers for "transportation to the training school, lodging during training, up to two meals/day during training,"

159.    These charges were relocation expenses of people under a contingent employment agreement and who were employees at the time the charges were made.

160.    I.C.A. § 91A.5(2)(g) provides that employers may not charge employees for relocation in amounts greater than $20.

**WHEREFORE**, Plaintiffs and Class Members demand payment by Defendants for all deductions made to their pay and damages due under I.C.A. § 91A.8 including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees

17

incurred in recovering the unpaid wages" and interest as provided by law.

## FIFTH CAUSE OF ACTION

### Forced Labor in Violation of the Trafficking Victims Protection Act 18 U.S.C. § 1589
### (On Behalf of Plaintiffs and the Class)

161.     Plaintiffs incorporate and reallege all paragraphs above.

162.     The "fundamental purpose" of the Trafficking Victims Protection Act is to "reach cases of servitude achieved through … threatened abuse of legal process."

163.     Under 18 U.S.C. § 1589(a)(3), a plaintiff must show that the defendant "knowingly provide[d] or obtain[ed]" plaintiffs' labor or services by means of … (3) "abuse or threatened abuse of law or legal process";

164.     18 U.S.C.A. § 1595 provides that "an individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees."

165.     CRST obtained the services of Mr. Cheatham and Plaintiff Drivers by transporting them to a location away from their homes with fraudulent misrepresentations and then forcing them to sign a Repayment Agreement that was replete with threats of legal process against Plaintiff Drivers for failing to drive with CRST, failure to pay the excessive debt and failure to adhere to the illegal non-competition clause in the Agreement.

**WHEREFORE**, Plaintiff and Class Members demand damages and reasonable attorneys' fees together with costs and interest as provided by law.

Deleted: ¶

Deleted: ¶

18

**SIXTH CAUSE OF ACTION**

**Unjust Enrichment**

**(On Behalf of Plaintiffs and the Class)**

166.    Plaintiff incorporates and re-alleges all paragraphs above.

167.    CRST was enriched by the repayment by Plaintiff and Plaintiff Drivers of a debt that in large part should not have existed.

168.    In particular, the penalty charge of $2750 constitutes unjust enrichment of CRST.

169.    In particular, the difference between the actual cost to CRST of driver training and the $3000 base charge for the training constitutes unjust enrichment of CRST.

170.    Plaintiff and Plaintiff Drivers earned funds that were kept by CRST or collected by CRST at the expense of the Plaintiff and Plaintiff Drivers.

171.    It is unjust to allow CRST to retain the benefit of repayment in this circumstance.


**SEVENTH CAUSE OF ACTION**

**Failure to Pay Minimum Wages in Violation of I.C.A. § 91D.1 *et seq***

**(On Behalf of Plaintiff and the Class)**

172.    Plaintiff incorporates and realleges all paragraphs above.

173.    I.C.A. § 91D.1 requires that each employer pay to its employee the state hourly wage, which, since 2008, has been $7.25 for each compensable hour they spend at the employer's behest.

174.    CRST had Plaintiff and Plaintiff Drivers working in teams and spending nearly 24 hours a day in a truck for six days per pay period.

175.    CRST had an obligation to compensate Plaintiff and Plaintiff drivers for eleven hours of drive time, three hours of transition time and two hours of non-berth time, for a total of sixteen hours per twenty-four-hour period they were on the road.

176.    CRST intentionally compensated Plaintiff and Plaintiff drivers at a rate that fell below minimum wage for each hour of compensable time.

177.    CRST intentionally paid Plaintiff Drivers well below the state hourly wage.

19

**WHEREFORE**, Plaintiff and Class Members demand payment by Defendants at the regular hourly pay rate for Drivers or the minimum wage rate, and damages due under I.C.A. § 91A.D1 including "wages or expenses that are so intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages" and interest as provided by law.

<u>**EIGHTH CAUSE OF ACTION**</u>

<u>**Failure to Pay Minimum Wages in Violation of the FLSA, 29 U.S.C § 206**</u>

**(On Behalf of Plaintiff and the FLSA Collective)**

178.   Plaintiff incorporates and realleges all paragraphs above.

179.   Under the FLSA, "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [federal minimum wage rate] …." 29 U.S.C. § 206(a)(l).

180.   As a result of Defendants policies and practices, Plaintiff and FLSA Collective Members were not paid minimum wages in that:

    a.   They were not paid for all training time;

    b.   They were paid by the mile without regard to the number of hours worked (and were not paid at all for some work) and thereby were not paid at least minimum wage for all hours worked;

    c.   They each had deductions taken from their paychecks and/or owed monies back to Defendants for the training that they were required to undergo at the beginning of their employment; and

    d.   They were not paid their wages free and clear.

181.   Defendants' violation of the FLSA has been willful, and Defendants knew or should have known that their policies and practices were unlawful.

**WHEREFORE**, Plaintiff and Collective Members demand payment by Defendants at the federal

20

minimum wage rate for all hours worked during the FLSA Period, plus an additional equal amount as liquidated damages, together with attorney's fees, costs, and interest as provided by law.

**NINTH CAUSE OF ACTION**

**Unlawful and Unconscionable Contractual Provisions**

**(On Behalf of Plaintiff, the Class, and the FLSA Collective)**

182. Defendants' CRST Commercial Driver's License Training and Repayment Agreement and Promissory Note and Defendants' Wage Deduction Authorization (collectively "Agreements") are unconscionable and violate the statutory and/or common law of Iowa and/or several states, as well as the FLSA.

183. Accordingly, these Agreements and/or their contractual provisions should be declared null and void, and Defendants should be enjoined from enforcing these Agreements and/or their unlawful or unconscionable provisions.

**ADDITIONAL PRAYER FOR RELIEF**

WHEREFORE Plaintiff, individually and on behalf of Class and Collective Members and all others similarly situated, prays for relief as follows:

1. For an order certifying this action as a class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class of Drivers;

2. For an order conditionally certifying this action as a collective action under the FLSA on behalf of the Collective Class;

3. For an order appointing Plaintiff as representative and his counsel as class counsel for the Class and FLSA Collective;

4. For damages, according to proof for the regular rate of pay under applicable state or federal law for all hours worked;

5. For liquidated damages and attorneys' fees according to proof for the minimum wage rate under I.C.A. § 91A.8;

21

6.     For wages or expenses that were intentionally failed to be paid or reimbursed, plus liquidated damages, court costs and any attorney's fees incurred in recovering the unpaid wages;

7.     For liquidated damages, pursuant to 29 U.S.C. § 216(b);

8.     For a declaration that the Agreements are null, void, and unenforceable;

9.     For a declaration that the non-competition provision in the Agreements is unenforceable;

10.     For a declaration that the purported class action waiver in the Agreements is unconscionable and/or unenforceable.

11.     For a declaration that the purported class action waiver in the Agreements constitutes an invalid waiver of rights under the FLSA and is thereby invalid and unenforceable.

12.     For an injunction preventing Defendants from pursuing collection of unlawfully charged amounts and/or deducting such amounts from employees' wages and requiring Defendants to take action to cease all third-party collections of these amounts and to take whatever actions are necessary to repair any damage done to employees' credit;

13.     For an injunction preventing Defendants from enforcing any unlawful or unconscionable provision in the Agreements;

14.     For interest as provided by law at the maximum legal rate.

15.     For reasonable attorneys' fees authorized by Federal law, Iowa law, common law, or equity;

16.     For costs of suit incurred herein;

17.     For pre-judgment and post-judgment interest at the maximum legal rate;

18.     For such other relief as the Court may deem just and proper.

Respectfully Submitted,

DATED: April 30, 2025

*/s/Rachel Mariner*
Rachel Mariner
RAFII & ASSOCIATES, P.C.
1120 N. Town Center Dr., Suite 130
Las Vegas, NV 89144

22

Tel: (725) 245-6056
rachel@rafiilaw.com
*Attorneys for Plaintiff*

Nathan Willems
Emily Shotthood
RUSH & NICHOLSON, P.L.C.
Tel: (319) 363-5209
nate@rushnicholson.com
emily@rushnicholson.com

23

**CERTIFICATE OF SERVICE**

The undersigned certifies, pursuant to LR 5(a), that a true and correct copy of this document was served electronically upon all parties to the above cause of action through the Court's ECF system to each of the attorneys of record herein at their respective addressees disclosed on the pleadings on April 30, 2025.


James H. Hanson
Angela S. Cash
Andrew J. Ireland
SCOPELITIS, GARVIN, LIGHT, HANSON & FEARY, P.C.
10 West Market Street, Suite 1400
Indianapolis, IN 46204
jhanson@scopelitis.com
acash@scopelitis.com
aireland@scopelitis.com
*Attorneys for Defendant*

Kevin J. Visser
SIMMONS PERRINE MOYER BERGMAN PLC
115 Third Street SE, Suite 1200
Cedar Rapids, IA 52401-1266
kvisser@spmblaw.com
*Attorneys for Defendant*


*/s/ Marcus Johnson*
An employee of RAFII & ASSOCIATES, P.C.

**Formatted:** Line spacing:  single

24